UNITED STATES DISTRICT COURT FILED
DISTRICT OF CONNECTICUT

2004 APR 27  A 10 53

MICHELA LEOCATA, through  :
Matthew T. Gilbride,
Conservator and Next Friend  :     CIVIL NO.    3:02CV1066(CFD)

    Plaintiff,  :

      vi.  :

PATRICIA WILSON-COKER,  :
Commissioner, Connecticut
Department of Social Services,  :

  and  :

TOMMY THOMPSON,  :
Secretary of Health and Human  :
Services,

    Defendants.  :     APRIL 26, 2004

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION

The plaintiff seeks a temporary injunction ordering the defendants to make reasonable accommodation by funding her stay at Arden Courts, (as soon as her estate is exhausted), while this matter is pending before the Court, and while on appeal if an appeal is taken by either party. The Plaintiff's funds are now very near exhaustion, and the Plaintiff will otherwise qualify for Title XIX funding. (See attached Exhibit "A"; Affidavit of Attorney Matthew Gilbride, Conservator of the Estate.)

Further, the plaintiff will suffer irreparable harm if the forgoing Motion for Temporary Injunction is not granted; the plaintiff can demonstrate the likelihood of success on the merits of her claims against the defendants; and there are

"sufficiently serious questions" on the merits and the balance of hardships are "tipping decidedly" in the plaintiff's favor.

## STATEMENT OF THE FACTS

This action was brought by the Plaintiff, Michela Leocata, throught the Conservator of her Estate and Next of Friend, Matthew Gilbride, against Patricia Wilson-Coker, Commissioner of the Department of Social Services of the State of Connectciut (the "Commissioner") and Tommy G. Thompson, Secretary of the United States Department of Health and Human Services (the "Secretary"). Both defendants have been sued in their official capacities with respect to their role in administering the Title XIX ("Medicaid") program.

The Plaintiff currently resides at Arden Courts, in Farmington, Connecticut, a managed residential community, where she receives services from an assisted living services agency ("ALSA"). (Complaint ¶ 2). She suffers from advanced dementia, but is otherwise in good physical health. (Complaint ¶ 2). The Plaintiff is currently using her private funds to pay for the cost of Arden Courts, (now about $4,500.00 per month), and expects to run out of money in the next few months. (Attached Exhibit "A"; Affidavit of Matthew T. Gilbride, Esq., Conservator of the Estate). The Plaintiff asserts that when her private funds are exhausted, she will have no means of paying Arden Courts and she will have to transfer to a skilled nursing facility where her care, including room and board, would be covered by the Title XIX ("Medicaid") program. (Complaint ¶ 7-10) (Attached Exhibit "A"). The parties are agreed that in the State of Connecticut, the Medicaid program does not currently cover services provided by an ALSA.

The resultant, forced transfer of Michela Leocata to a new facility will result in irreparable harm to her from the trauma of removal and readjustment to foreign surroundings. (Attached Exhibit "B"; Affidavit of Attorney Frances Z. Calafiore, Conservator of the Person).

Because the State and Federal government's will be required to pay substantially more for the Plaintiff's care at a skilled nursing facility, than funding her current care at Arden Courts, the Plaintiff asserts that such application of the Medicaid administrative regulations violates her rights to Due Process and Equal Protection. Further, the Plaintiff asserts that such forced removal to a skilled Nursing Facility violates the "reasonable accommodation" requirements of Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132, et seq. ; see also _Olmstead v. L.C. ex rel. Zimring_, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

## NATURE OF THE PROCEEDINGS

On September 19, 2003, the parties argued before the Court their positions in reference to both Defendants separate Motions to Dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to F.R.C.P. 12(b)(6).

At said argument, the Plaintiff, by and through counsel, respectfully requested the Court allow her to amend her complaint to include the claim that the defendant's refusal to fund her stay at Arden Courts would be violative of Title II of the ADA in light of Justice Ginsburg's decision in _Olmstead_.   The matter is still before the Court under advisement.

Because the Plaintiff will be required to move from Arden Courts shortly, as her private funds are on the verge of total exhaustion, she respectfully asks the Court to temporarily order the defendants to fund her stay at Arden Courts upon her qualification for Medicaid benefits. Such action would allow her to remain in her home, without the trauma of a forced removal, while she prosecutes her claims in Court, and on appeal if necessary. The defendant's, ironically, will benefit from such a temporary order, insofar as they will be spending markedly less money to maintain her at Arden Courts then paying for her placement at a Skilled Nursing Facility. The plaintiff asserts that if the Court does not grant her request for a temporary injunction, that she will suffer irreparable harm from the reality of a forced removal and the shock and trauma of new surroundings; further, she asserts that she can demonstrate the likelihood of success on the merits of her claims; and finally, she asserts that there are "sufficiently serious questions" on the merits and the balance of hardships are "tipping decidedly" in her favor.

## LEGAL ARGUMENT

Fed.R.Civ.P. 65 provides the standard by which the Court must review a party's motion for a preliminary injunction. The party moving for a preliminary injunction may meet its burden by showing either (1) probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Roe*

v. Anderson, 134 F.3d 1400, 1402 (9th Cir.1998); Johnson v. California Bd. of
Accountancy, 72 F.3d 1427, 1430 (9th Cir.1995).

Generally, preliminary injunctive relief is disfavored, and warranted only in
"extraordinary circumstances." Taylor v. Freeman, 34 F.3d 266, 270, n. 2 (4th
Cir.1994) (citations omitted). For this reason, the movant bears the burden of
proof on four independent factors:

(1) the likelihood of irreparable harm to movant if the opposing party is not
enjoined;
(2) compared to the likelihood of irreparable harm to the opposing party if
enjoined;
(3) the likelihood of movant's success on the merits of the claims; and
(4) whether the public interest favors the plaintiff or the defendant.

See Manning v. Hunt, 119 F.3d 254 (4th Cir.1997) (quoting Direx Israel, Ltd. v.
Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir.1991), and Blackwelder
Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc., 550 F.2d 189, 193 (4th
Cir.1977)). The court in Manning stated that the district court must consider all of
the factors in reaching its decision on a preliminary injunction. Manning, 119 F.3d
at 263. Additionally, the court made clear that in all cases the district court should
first consider the balancing of the harms. Id. The court stated that "until the
balance of the harms has been made, the district judge cannot know how strong
and substantial must be the [movant's] showing of 'likelihood of success.' "
Manning, 119 F.3d at 264.

If the hardship balance favors the movant, then the likelihood of success
factor is displaced and the movant must only show that the questions presented
are serious, substantial and difficult enough to make them fair ground for the

upcoming litigation. *See* Direx, 952 F.2d at 812-13. However, the converse is also true, and if the hardship balance weighs in favor of the respondent, then the movant has a stricter burden to show likelihood of success. *Manning, 119 F.3d at 264.* Finally, after balancing the harms and determining the degree of substantial likelihood of success which is required and whether the movant has satisfied that burden, then, the court must consider whether a preliminary injunction is in the public's interest. *Manning, 119 F.3d at 264.*

In the Second Circuit, "a preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray Wrap, Inc., 917 F.2d 75, 80 (2d Cir.1990).* To prevail on a motion for a preliminary injunction, a plaintiff ordinarily must demonstrate: (1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) "sufficiently serious questions" on the merits and a balance of hardships "tipping decidedly" in the movant's favor. *Brooks v. Giuliani, 84 F.3d 1454, 1462 (2d Cir.1996)* (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979)).* To obtain a mandatory injunction, the moving party must demonstrate a clear or substantial likelihood of success on the merits, or that it will suffer extreme or very serious damage if denied preliminary relief. *Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir.1996); Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir.1985).*

However, a party moving for a mandatory injunction which alters the status quo by commanding some positive act must meet a higher standard. *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33-35 (2d Cir.1995).* The primary purpose of injunctive relief is to preserve the status quo pending a

resolution on the merits. Injunctive relief which changes the status quo pending

trial is limited to cases where "the exigencies of the situation demand such relief."

*Wetzel v. Edwards,* 635 F.2d 283, 286 (4th Cir.1980).  Because the plaintiff

seeks a mandatory injunction--i.e., an injunctive order which alters the status quo

with a positive act--the heightened standard will apply.  In the present matter, the

plaintiff is able to meet that heightened standard.

## A.    Irreparable Harm

A showing of irreparable harm is the "single most important prerequisite

for the issuance of a preliminary injunction." *Brown v. Guiliani,* 158 F.R.D. 251,

264 (E.D.N.Y.1994) (quoting *Bell and Howell v. Masel Supply Co.,* 719 F.2d 42,

45 (2d Cir.1983)). Before the other requirements for a preliminary injunction will

be considered, the movant must show that injury is likely. *Id.* "Irreparable harm

must be shown to be imminent, not remote or speculative, and the injury must be

such that it cannot be fully remedied by monetary damages." *Brown,* 158 F.R.D.

at 264 (quoting *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975

(2d Cir.1989)).

In this case, plaintiff asserts that she will be severely traumatized by a

forced removal from her home, and the shock of having to make an adjustment

to new surroundings if she is forced to go to a nursing home.  Plaintiffs' assertion

of irreparable harm finds support in cases holding that the deprivation of

mandated educational services will result in irreparable harm. *See, e.g., A.T. v.*

*New York State Educ. Dep't,* No. 98-CV-4166, 1998 WL 765371, at *10 (E.D.N.Y.

Aug. 4, 1998) (holding that child who was denied a free and appropriate public education under the IDEA was suffering actual and imminent harm); _Borough of Palmyra Bd. of Educ. v. F.C.,_ 2 F.Supp.2d 637, 645 (D.N.J.1998) (holding that loss of appropriate education for child with Attention Deficit Disorder would constitute irreparable harm); _J.B. v. Killingly Bd. of Educ.,_ 990 F.Supp. 57, 72 (D.Conn.1997) (holding that continued denial of a free appropriate public education satisfied irreparable harm element). Moreover, any trauma suffered as a result of forced removal cannot be fully remedied by monetary damages.

## B.    Substantial Likelihood of Success on the Merits

As more fully argued in her memoranda of law in opposition to the motions to dismiss filed by each defendant, and already before the Court, the Plaintiff asserts that there is no rational relationship between refusing to fund her stay at Arden Courts and any legitimate governmental interest, therefore her rights to Due Process and Equal Protection are violated by the defendants' refusal to fund her stay at Arden Courts; also, the Plaintiff has a meritorious claim under Title II of the ADA.

### 1. Due Process

The touchstone for the Court's Due Process analysis is _Youngberg v. Romeo,_ 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In _Youngberg,_ the Court addressed the substantive rights of a mentally retarded individual who was confined involuntarily to a state mental institution. "Under _Youngberg,_ the plaintiffs in this case possess substantive liberty interests that require the State to

provide adequately safe conditions, reasonable freedom from bodily restraint, and 'minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Youngberg, 457 U.S. at 319, 102 S.Ct. at 2460).* To determine whether those rights have been violated, the court must balance the plaintiffs' "liberty interests against the relevant state interests." *Youngberg, 457 U.S. at 321, 102 S.Ct. at 2461.*

The Plaintiff in the instant matter has a right to her liberty, and does not require the assistance of a skilled nursing facility at this time.  To confine her to a skilled nursing facility when a less restrictive alternative, here, Arden Courts, is available, and markedly cheaper, is outbalanced by her "liberty interest" to remain free of the nursing home.  The State may not confine patients to mental institutions who do not belong there simply because it is financially or politically expedient to do so, *see Thomas S. by Brooks v. Flaherty (Thomas S. III), 699 F.Supp. 1178, 1196 (W.D.N.C. 1988); Thomas S. by Brooks v. Flaherty (Thomas S. II), 781 F.2d 367, 375* (W.D.N.C. 1986).

## 2.    Equal Protection

The Plaintiff further asserts that the defendants' failure to fund her continued stay at Arden Courts violates her rights to Equal Protection.  Since the oral argument on September 19, 2003, the Massachusetts Supreme Court held that the State could not deny homosexuals the right to intermarry, **while engaging in rational relationship review** of the relevant Massachusetts statute. *See Goodridge v. Department of Public Health*, 440 Mass. 309, 344, 798 N.E.2d

941 (Mass. 2003)(as matter of first impression, limitation of protections, benefits and obligations of civil marriage to individuals of opposite sexes lacked rational basis and violated state constitutional equal protection principles).

As the *Goodridge* Court recognized not every asserted rational relationship is a "conceivable" one, and rationality review is not "toothless." *Murphy v. Commissioner of the Dep't of Indus. Accs.,* 415 Mass. 218, 233, 612 N.E.2d 1149 (1993), *citing Mathews v. Lucas,* 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). Statutes have failed rational basis review even in circumstances where no fundamental right or "suspect" classification is implicated. *See, e.g., Murphy v. Commissioner of the Dep't of Indus. Accs.,* 415 Mass. 218, 226-227, 612 N.E.2d 1149 (1993) (fee imposed on retention of counsel in administrative proceedings); *Secretary of the Commonwealth v. City Clerk of Lowell,* 373 Mass. 178, 186, 366 N.E.2d 717 (1977) (selection of surname for nonmarital child); *Aetna Cas. & Sur. Co. v. Commissioner of Ins., 358 Mass. 272, 280-281, 263 N.E.2d 698 (1970) (automobile insurance ratesetting); Coffee-Rich, Inc. v. Commissioner of Pub. Health, 348 Mass. 414, 422, 204 N.E.2d 281 (1965) (sale of wholesome product);* Mansfield Beauty Academy, Inc. v. Board of Registration of Hairdressers, *326 Mass. 624, 627, 96 N.E.2d 145(1951) (right to charge for materials furnished to models by trade school);* Opinion of the Justices, *322 Mass. 755, 760-761, 79 N.E.2d 883 (1948) (proposed statute concerning regulating cemeteries);* Boston Elevated Ry. v. Commonwealth, *310 Mass. 528, 556-557, 39 N.E.2d 87 (1942) (legislation impairing contract right);* Durgin v. Minot, *203 Mass. 26, 28, 89 N.E. 144 (1909)*

*(statute authorizing certain board of health regulations). Id. Goodridge, footnote
20, at page 330.*

The Plaintiff in the present matter asserts that the failure of the defendants
to fund her stay at Arden Courts is likewise irrational, and violative of her right to
Equal Protection.

### 3.    Title II of the ADA

Furthermore, as the Plaintiff asserted at oral argument on the motions to
dismiss, the facts of her case closely resemble those in *Olmstead*.  *Olmstead*
held that the ADA requires a state to provide community-based treatment to
mentally disabled persons "when the State's treatment officials have determined
that community placement is appropriate, the transfer from institutional care to a
less restrictive setting is not opposed by the affected individual, and the
placement can be reasonably accommodated, taking into account the resources
available to the State, and the needs of others with disabilities." 527 U.S. at 587,
119 S.Ct. 2176.  As a result, the defendants' failure to fund her care at Arden
Courts violates Title II of the ADA, insofar as it represents a failure on the part of
the government to make a reasonable accommodation for the Plaintiff.

In *Martin v. Taft*, 222 F.Supp.2d 940 9S.D.Ohio 2002) the plaintiffs were a
class of persons with mental retardation or developmental disabilities and
subclass of Medicaid recipients brought action against governor of Ohio, Ohio
Department of Mental Retardation and Developmental Disabilities (ODMR/DD)
and its director, and Ohio Department of Human Services (ODHS) and its

director alleging violations of civil rights under the Constitution, the Rehabilitation Act, the Americans with Disabilities Act (ADA), and the Social Security Act. The Court in *Martin* concluded that the defendants were not immune from suit under the Eleventh Amendment, and that, for the most part, the plaintiffs stated viable claims under federal law. *Id.* at 946.

In *Martin*, the Court stated "the significance of *Olmstead* cannot be overstated. The outcome of this case may depend largely on *Olmstead*'s central holding that unnecessary institutionalization of persons with mental disabilities constitutes discrimination under the ADA, as well as the limitations the Court placed upon that basic concept." In footnote 16, the Court in *Martin* observed that "the title of one scholarly article vividly illustrates *Olmstead*'s importance. Mary C. Cerreto, *Olmstead: The Brown v. Board of Education for Disability Rights Promises, Limits, and Issues*, 3 Loy. J. Pub. Int. L. 47 (2001)("Cerreto")." *Id.* at 965.

At oral argument on the motions to dismiss, the plaintiff in the instant matter, requested that she be allowed to amend her complaint to include the claim that the defendant's refusal to fund care at Arden Courts violates Title II of the ADA. The defendants objected to this request, however, the federal courts have a liberal policy ordinarily allowing the amendment of complaints, and are loathe to dismiss complaints as long as there is some cognizable legal theory supporting relief for the plaintiff.

In *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957), the Court held that "a complaint should not be dismissed for failure to

state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief". *See also* <u>Barrett v. Tallon</u>, 30 F.3d 1296, 1299 (10th Cir. 1994). In <u>Mid America Title Co. v. Kirk</u>, the Seventh Circuit held, that "consistent with obligation to construe complaints liberally, the pleader is not required to identify a specific legal theory, and labeling the complaint with an incorrect legal theory is not fatal." 991 F.2d 417, 421 (7th Cir. 1993), *cert. denied*, 510 U.S. 932, 114 S.Ct. 346, 126 L.Ed.2d 310 (1993).

Before dismissing for failing to state a claim, the federal courts examine the complaint to discern whether the pleader could be entitled to any type of relief under **any** possible legal theory. *See* <u>Bowers v. Hardwick</u>, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986); *see also* <u>Carparts Distribution Ctr. V. Automotive Wholesaler's Ass'n. of New England, Inc.</u>, 37 F.3d 12, 17 (1st Cir. 1994)("For purposes of Fed.R.Civ.P. 12(b)(6), the possibility of a claim is enough to defeat dismissal").

Finally, in <u>Welch v. Laney</u>, 57 F.3d 1004, 1009 (11th Cir. 1995), the Court of Appeals for the eleventh Circuit held that "where a more artfully drawn complaint might state a cognizable claim for relief, the court should grant leave to amend, rather than order the complaint dismissed." *See also* <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 941 F.2d 119 (2nd Cir.1991).

**C.    Balance of the Hardships**

Ironically, and also supporting the overall claims on the merits, the defendants face no hardships if the Court were to grant the Motion for Temporary

Injunction. They actually would save thousands of dollars in unnecessary health care costs, and would free up needed bed space at some nursing home which is needed for individuals who require such intensive care. On the other hand, the Plaintiff would be forced to suffer the severe trauma and shock of being forcedly removed from her home and made to undergo strange new surroundings, given her advanced dementia while continuing to prosecute her case in the District Court and potentially on appeal. The "balance of the hardships" **strongly** cuts in the Plaintiff's favor in the present matter.

## CONCLUSION

For all of the above stated reasons, the Plaintiff respectfully requests the Court grant her application for a temporary injunction requiring the defendants to fund her stay at Arden Courts as soon as her private funds are exhausted while this matter is before the Court and on appeal.

RESPECTFULLY SUBMITTED,
THE PLAINTIFF

BY: _____
Raymond J. Rigat, Esq.
Her Attorney
Gilbride & Rigat
23 East Main Street
Clinton, Connecticut  06413
Tel.: (860) 669-3273
Fax: (860) 669-3495
E-Mail: raymondjrigat@sbcglobal.net
R. J. R. Federal Bar No.: ct13320

## CERTIFICATION

This is to certify that a copy of the foregoing Memorandum of Law in Support of Plaintiff's Motion for Temporary Injunction has been mailed, first-class, postage pre-paid, on this 26th day of April, 2004, to:

Attorney Tanya Feliciano
Office of the Attorney General
Health and Human Services
55 elm Street
P.O. Box 120
Hartford, Connecticut  06101;

Attorney Carolyn A. Ikari
Assistant United State Attorney
450 Main Street
Hartford, Connecticut  06103; AND

Attorney Clifford M. Pierce
Assistant Regional Counsel
Department of Health and Human Resources
J.F.K. Building, Room 2250
Boston, MA  02203

Raymond J. Rigat, Esq.

Affidavit of Attorney Matthew T. Gilbride

State of Connecticut

ss. Town of Clinton

County of Middlesex

1. I am over the age of eighteen years and believe in the obligations of an oath.

2. I am an attorney practicing in the State of Connecticut and a commissioner of the Superior Court.

3. I am the Probate Court appointed Conservator of the Estate of Michela Leocata.

4. I have attached the most recent Interim Accounting (reflecting Michela Leocata's financial status as of February 10, 2004)to this affidavit; the said accounting was accepted by the Hartford Probate Court on April 22, 2004 (a copy of said order is attached to this affidavit).

5. Approximately $9,000.00 should be subtracted from her overall listed balance as reflective of the March and April 2004 fees for Arden Courts.

6. Arden Courts is approximately $4,500.00 per month

7. Ms. Leocata will have additional conservator fees and legal costs in the near future.

8. Ms. Leocata has prescription bills between $300.00-$500.00 per month.

9. I estimate that unless Medicaid pays for her continued stay at Arden Courts she will need to be placed in a skilled nursing home sometime around September of this year.

10. I have extensive experience and knowledge concerning Title XIX and Medicare, and the qualification of persons for said benefits.

11. In my professional opinion, Ms. Leocata will otherwise be eligible for Title XIX, Medicaid benefits upon final exhaustion of her estate.

Dated at Clinton, Connecticut, this 26 day of April, 2004.

Matthew T. Gilbride, Esq.

Subscribed and sworn to before me
This 26 day of April, 2004.

Joyce M. Kjos
Notary Public

JOYCE M. KJOS
NOTARY PUBLIC
MY COMMISSION EXPIRES FEB. 28, 2007

EXHIBIT "A"

DECREE: INTERIM ACCOUNT     **STATE OF CONNECTICUT**     RECORDED:
(NON-DECEDENT)
PC-461  NEW  5/93           **COURT OF PROBATE**

---

**COURT OF PROBATE, DISTRICT OF Hartford**       **DISTRICT NO. 064**

---

ESTATE OF

     Michela Leocata   (98-2125)

FIDUCIARY:

     Attorney Matthew T. Gilbride

---

          PERIODIC ACCOUNTING

Dated: February 10, 2004     Received: February 13, 2004

TYPE:     CONSERVATOR

COVERING THE PERIOD COMMENCING: March 09, 2001     ENDING: February 10, 2004

---

PRESENT: Hon. Robert K. Killian, Jr., Judge

At the time and place set by order of this Court, together with any continuances thereof, as on file more fully appears, for a hearing on the allowance of the above-designated Accounting, the Court, after due hearing had, FINDS THAT:

     Notice was given in accordance with the Order(s) of Notice previously given.

After having examined said Accounting, together with all supporting documents, the Court FURTHER FINDS THAT:

     Said Accounting is true, and accordingly, the same is approved and allowed and ORDERED recorded and filed.

Dated at Hartford, Connecticut, this 22nd day of April, 2004.

..................................................................
                           Robert K. Killian, Jr., Judge

**A TRUE COPY**
**ATTEST:** _____
               ASSISTANT CLERK

RECEIVED
APR 2 3 2004
BY:_____

---

DECREE: INTERIM ACCOUNT
PC-461

| ESTATE OF | : | PROBATE COURT |
|---|---|---|
| | : | |
| MICHELA LEOCATA | : | DISTRICT OF HARTFORD |
| | : | |
| | : | DISTRICT # 064 |
| | : | |
| | : | February 10, 2004 |

## INTERIM ACCOUNTING
(March 9, 2001 to February 10, 2004)

I.    ASSETS as of last accounting March 9, 2001............. $ 207,053.64

    A.    Cash Amount on Hand................................. $ 181,873.39
    B.    Approximate Credit balance forward from
          Arden Court not reflected in last accounting....... $   25,180.25

II.    INCOME Received by Fiduciary......................... $   23,894.70

    1.    Interest on Sovereign Bank Checking Account... $        370.90

| January 16, 2004 | 2.42 |
|---|---|
| December 19, 2003 | 2.72 |
| November 19, 2003 | 2.64 |
| October 17, 2003 | 2.35 |
| September 19, 2003 | 2.74 |
| August 19, 2003 | 2.46 |
| July 18, 2003 | 3.62 |
| June 4, 2003 | 6.46 |
| May 19, 2003 | 5.93 |
| April 18, 2003 | 8.31 |
| March 19, 2003 | 7.93 |
| February 19, 2003 | 8.67 |
| January 17, 2003 | 10.04 |
| December 19, 2002 | 7.20 |
| November 19, 2002 | 6.47 |
| October 18, 2002 | 6.33 |
| September 19, 2002 | 6.32 |
| August 19, 2002 | 6.26 |
| July 19, 2002 | 6.93 |
| June 19, 2002 | 6.58 |
| May 17, 2002 | 6.02 |
| April 19, 2002 | 6.98 |
| March 19, 2002 | 5.88 |

| | |
|---|---|
| February 19, 2002 | 6.22 |
| January 18, 2002 | 8.06 |
| December 19, 2001 | 7.65 |
| November 19, 2001 | 8.31 |
| October 19, 2001 | 15.72 |
| September 19, 2001 | 28.20 |
| August 13, 2001 | 28.09 |
| July 19, 2001 | 26.81 |
| June 19, 2001 | 27.11 |
| May 18, 2001 | 28.02 |
| April 19, 2001 | 27.63 |
| March 19, 2001 | 27.72 |

2.　　Interest on Sovereign Money Market................ $　37.53
　　　(Ultimate Money Market Savings #50000053905)

| | |
|---|---|
| December 31, 2003 | .49 |
| November 28, 2003 | .47 |
| October 31, 2003 | .49 |
| September 30, 2003 | .47 |
| August 29, 2003 | .49 |
| July 31, 2003 | .49 |
| June 30, 2003 | .71 |
| May 30, 2003 | .76 |
| April 30, 2003 | .75 |
| March 31, 2003 | .81 |
| February 28, 2003 | .73 |
| January 31, 2003 | .81 |
| December 31, 2002 | .81 |
| December 19, 2002 | .79 |
| October 31, 2002 | 1.08 |
| September 30, 2002 | 1.05 |
| August 30, 2002 | 1.08 |
| July 31, 2002 | 1.08 |
| June 28, 2002 | 1.04 |
| May 31, 2002 | 1.08 |
| April 30, 2002 | 1.04 |
| March 29, 2002 | 1.08 |
| February 28, 2002 | .97 |
| January 31, 2002 | 1.07 |
| December 31, 2001 | 1.07 |
| November 30, 2001 | 1.04 |
| October 31, 2001 | 1.13 |

| | |
|---|---|
| September 28, 2001 | 1.71 |
| August 31, 2001 | 1.90 |
| July 31, 2001 | 1.90 |
| June 29, 2001 | 1.83 |
| May 31, 2001 | 1.89 |
| April 30, 2001 | 1.83 |
| March 30, 2001 | 1.89 |
| February 28, 2001 | 1.70 |

3.    Misc. Deposits.................................... … $    368.48

| | | |
|---|---|---|
| January 2, 2003 | $ | 60.59 |
| April 5, 2002 | $ | 106.39 |
| April 4, 2002 | $ | 196.50 |
| November 2, 2001 | $ | 5.00 |

4.    Rebate from University of Connecticut
       Health Center....................................... …$   2,319.79

5.    Social Security........................................ $ 20,798.00
       (direct deposit to Sovereign Bank Checking Account)

| | |
|---|---|
| January 2, 2004 | 623.00 |
| December 3, 2003 | 617.00 |
| November 3, 2003 | 617.00 |
| October 3, 2003 | 617.00 |
| September 3, 2003 | 617.00 |
| August 1, 2003 | 617.00 |
| July 3, 2003 | 617.00 |
| June 3, 2003 | 617.00 |
| May 2, 2003 | 617.00 |
| April 3, 2003 | 617.00 |
| March 3, 2003 | 617.00 |
| February 3, 2003 | 617.00 |
| January 3, 2003 | 617.00 |
| December 3, 2002 | 613.00 |
| November 1, 2002 | 613.00 |
| October 3, 2002 | 613.00 |
| September 3, 2002 | 613.00 |
| August 2, 2002 | 613.00 |
| July 3, 2002 | 613.00 |
| June 3, 2002 | 613.00 |
| May 3, 2002 | 613.00 |

April 3, 2002            613.00
March 1, 2002            613.00
February 1, 2002         613.00
January 3, 2002          613.00

December 3, 2001         600.00
November 2, 2001         600.00
October 3, 2001          600.00
August 31, 2001          600.00
August 3, 2001           600.00
July 16, 2001             19.00
July 3, 2001             599.00
June 1, 2001             599.00
May 3, 2001              599.00
April 3, 2001            599.00

III.   PAYMENTS AND DISTRIBUTIONS
       BY FIDUCIARY.......................................... $ 186,586.97

       A.   Payments made by fiduciary pursuant
            to attached Schedule "A".................... $ 186,586.97

IV.    AMOUNT ON HAND.................................. $ 44,517.84

       A.   Sovereign Bank Accounts................... $ 28,631.61
            (as of January 19, 2004)

            a.   Ultimate Plus Account
                 # 50000030341........................ $ 27,348.15

            b.   Ultimate Money Market
                 Savings Account
                 # 50000053905...................... $   1,283.46

       B.   Arden Courts................................. $ 15,886.23
            (Credit Balance Forward as of
            January 31, 2004 )

V.     TOTAL OF ITEMS I, AND II....................... $ 230,948.34

VI.    ITEM III and item IV ..............................$ 231,104.81


There is an approximate $156.47 discrepency in favor of the estate which the
undersigned cannot reconcile.

RESPECTFULLY SUBMITTED,

Matthew T. Gilbride, Esq.
Conservator of the Estate of
Michela Leocata
Gilbride & Rigat
23 East Main Street
Clinton, Connecticut  06413
Tel.: (860) 669-3273
Fax: (860) 669-3495
Juris No.: 402731

Sworn to and Subscribed to me by Matthew T. Gilbride, Esq. this 10th day of
February, 2004.

Raymond J. Rigat, Esq.
Commissioner of the Superior Court
Juris No.: 403047

## SCHEDULE "A" ITEMIZED EXPENSES
(March 9, 2001 to February 10, 2004)

TOTAL.............................................................$ 186,586.97


**Arden Courts**........................................................ $ 151,180.83

| June 7, 2001 | $ | 4,120.00 |
| June 7, 2001 | $ | 66,210.85 |
| June 7, 2001 | $ | 68,659.98 |
| June 7, 2001 | $ | 4,190.00 |
| @April 30, 2001 | @$ | 4,000.00 |
| @May 30, 2001 | @$ | 4,000.00 |


*credit balance forward of $ 15,886.33 reflected on part IV of accounting

Monthly Payments

| February 29, 2004 | 4,541.00 |
| January 31, 2004 | 4,325.00 |
| | |
| December 31, 2003 | 4,325.00 |
| November 30, 2003 | 4,325.00 |
| October 31, 2003 | 4,325.00 |
| September 30, 2003 | 4,325.00 |
| August 31, 2003 | 4,325.00 |
| July 31, 2003 | 4,325.00 |
| June 30, 2003 | 4,325.00 |
| May 31, 2003 | 4,325.00 |
| April 30, 2003 | @4,325.00 |
| March 31, 2003 | @4,325.00 |
| February 28, 2003 | 4,325.00 |
| January 31, 2003 | 4,325.00 |
| | |
| December 31, 2002 | @ 4,325.00 |
| November 30, 2002 | 4,325.00 |
| October 31, 2002 | 4,120.00 |
| September 30, 2002 | 4,120.00 |

August 31, 2002           4,120.00
July 31, 2002             4,120.00
June 30, 2002             4,120.00
May 31, 2002              4,120.00
April 30, 2002            4,120.00
March 31, 2002            4,120.00
February 28, 2002         4,120.00
January 31, 2002          4,120.00

December 31, 2001         4,120.00
November 30, 2001         4,120.00
October 31, 2001          4,120.00
September 30, 2001        4,120.00
August 31, 2001           4,120.00
July 31, 2001            @4,120.00
June 30, 2001            @4,120.00
May 31, 2001              4,000.00
April  30, 2001           4,000.00
March 31, 2001            4,000.00

**Health Drive Podiatry**……………….…………….……….. $   250.00

| August 20, 2003 | #1304 | $ | 39.27 |
| January 24, 2003 | #1297 | $ | 3.54 |
| October 2, 2002 | #1285 | $ | 57.06 |
| September 19, 2002 | #1284 | $ | 64.13 |
| October 30, 2001 | #1251 | $ | 43.00 |
| May 31, 2001 | #1244 | $ | 43.00 |

**Value Health Care Services, Inc.**
**(prescriptions)**……………………………………………. $ 11,003.60

| January 23, 2004 | #1316 | 775.55 |
| December 30, 2003 | #1314 | 1,000.00 |
| November 13, 2003 | #1309 | 469.11 |
| November 10, 2003 | #1307 | 8.52 |
| July 21, 2003 | #1302 | 666.57 |
| July 14, 2003 | #1300 | 929.83 |
| June 3, 2003 | #1299 | 539.89 |
| December 30, 2002 | #1290 | 650.32 |
| October 23, 2002 | #1289 | 283.99 |
| September 19, 2002 | #1283 | 583.53 |
| August 9, 2002 | #1280 | 649.24 |
| May 10, 2002 | #1278 | 303.78 |

| April 11, 2002 | #1276 | 273.40 |
| March 13, 2002 | #1273 | 287.57 |
| January 30, 2002 | #1266 | 717.44 |
| January 8, 2002 | #1294 | 346.91 |
| November 14, 2001 | #1255 | 362.92 |
| October 30, 2001 | #1254 | 277.93 |
| August 24, 2001 | #1248 | 450.59 |
| August 9, 2001 | #1247 | 250.26 |
| June 19, 2001 | #1246 | 255.51 |
| May 31, 2001 | #1242 | 651.54 |
| March 16, 2001 | #1240 | 269.20 |

**University Physicians**................................................ $ 3,172.30

| January 14, 2004 | #1315 | 18.95 |
| August 20, 2003 | #1303 | 22.58 |
| July 21, 2003 | #1301 | 48.14 |
| August 9, 2002 | #1281 | 2,350.00 |
| April 26, 2002 | #1277 | 57.38 |
| March 25, 2002 | #1275 | 26.46 |
| January 30, 2002 | #1265 | 498.86 |
| January 8, 2002 | #1295 | 17.22 |
| November 26, 2001 | #1258 | 34.30 |
| October 30, 2001 | #1253 | 88.00 |
| May 31, 2001 | #1245 | 10.41 |

**Geriatric and Family Psychiatry, Inc**.............................. $ 92.92

| February 10, 2004 | #1319 | 46.93 |
| January 23, 2004 | #1317 | 18.64 |
| November 25, 2003 | #1312 | 27.35 |

**Hartford Anesthesiology Associates**........................... $ 91.58

| August 9, 2002 | #1282 | 45.79 |
| March 13, 2002 | #1274 | 45.79 |

**Burgess Health Associates**..................................... $ 38.11

| March 13, 2002 | #1272 | 38.11 |

**American Medical Response**.................................... $ 262.78

February 12, 2002          #1271          50.00
February 12, 2002          #1270          56.39
January 8, 2002            #1264          50.00
January 8, 2002            #1263          50.00
January 8, 2002            #1262          56.39

**NCO Financial Sysytems**
**(Ambulance)**..................................................................$   33.00

November 10, 2003          #1308          33.00

**University of Connecticut Health Center;**
**John Dempsey Hospital**.........................................  $   903.30

February 1, 2002           #1269          903.30

**New Britain General**.................................................$   682.86

December 1, 2003           #1313          682.86

**Footprints Fashion Footwear, Inc**.............................  $   104.94

January 30, 2002           #1268          104.94

**Older Adult Services, Inc**.......................................  $ 275.50

October 23, 2002           #1288          87.00
January 30, 2002           #1267          58.00
January 8, 2002            #1293          130.50

**Nursing Services, Inc**.............................................  $   29.00

November 24, 2003          #1311          29.00

**Attorney Fran Califiore**
**Conservator of the Person**.....................................  $ 4,162.50

January 8, 2002            #1292          1,000.00
January 8, 2002            #1291          3,162.50

**Attorney Matthew T. Gilbride,**
**Gilbride & Rigat**
**Conservator of the Estate**...................................... $ 6,000.00
* See attched billing statements

| | | |
|---|---|---|
| February 2, 2004 | #1318 | 2,000.00 |
| January 24, 2003 | #1296 | 4,000.00 |

**Cummings & Lockwood**...................................... $ 1,241.00

| | | |
|---|---|---|
| October 23, 2002 | #1287 | 476.00 |
| May 31, 2001 | #1241 | 765.00 |

**David Zuber, CPA**................................................ $  175.00

| | | |
|---|---|---|
| October 30, 2001 | #1252 | 175.00 |

**Hartford Probate Court**.......................................... $ 535.75

| | | |
|---|---|---|
| February 10, 2004 | #1320 | 150.00 |
| October 30, 2001 | #1250 | 385.75 |

**Kronholm & Keeler, Inc**...................................... $ 952.00

| | | |
|---|---|---|
| September 23, 2003 | #1305 | 476.00 |
| October 30, 2001 | #1249 | 476.00 |

**Swan Funeral Home**........................................ $  5,400.00

| | | |
|---|---|---|
| November 21, 2001 | #1256 | 5,400.00 |

GILBRIDE & RIGAT
Attorneys At Law
23 East Main Street
Clinton, Connecticut  06413

TO THE ESTATE OF MICHELA LEOCATA

For professional services rendered as Conservator of the Estate
Of Michela Leocata

40 hours for 24 months (March 10, 2001 to February 19, 2003) at $100.00
per hour

TOTAL................................................................ $4,000.00

FEBRUARY 19, 2003  PAID CHECK # 1237

GILBRIDE & RIGAT
Attorneys At Law
23 East Main Street
Clinton, Connecticut  06413


TO THE ESTATE OF MICHELA LEOCATA

For professional services rendered as Conservator of the Estate
Of Michela Leocata

20 hours for 12 months (February 19, 2003 to February 02, 2004) at $100.00
per hour


TOTAL……………………………………………………….. $2,000.00

FEBRUARY 02, 2004  PAID CHECK # 1318

# C E R T I F I C A T I O N

A copy of the foregoing Interim Accounting along with Schedule "A" to same has been sent, postage pre-paid, this 10th day of February, 2004 to the following:

Attorney Frances Z. Calafiore
55 Airport Road
Hartford, Connecticut  06114;

Attorney Gina S. Linstone
Cummings & Lockwood
CityPlace 1
185 Asylum Street
Hartford, Connecticut  06103-3495; AND

Mr. Joseph Indimenico
131 Exeter Street
Hartford, Connecticut  06114

Matthew T. Gilbride, Esq.

Affidavit of Attorney Frances Z. Calafiore

State of Connecticut

                ss. Hartford

County of Hartford

1.      I am over the age of eighteen years and I believe in the obligation of an oath.

2.      I am an attorney practicing in the State of Connecticut and a commissioner of the Superior Court.

3.      I am the Court-appointed conservator over the person of Michela Leocata a resident of Arden Courts, Farmington, Connecticut.

4.      I see Ms. Leocata and speak with her healthcare providers on a regular basis.

5.      Ms. Leocata is in reasonably good physical health for her age, and she does not require the services of a nursing home.

6.      Her needs have been, and continue to be, well-addressed at Arden Courts.

7.      Ms. Leocata has formed beneficial relationships at Arden Courts, but her current medical condition and her inability to communicate verbally, greatly impair her ability to learn new things, adopt to new environments and form new relationships.

8.      It is my opinion as conservator over her person, based on my discussions with her healthcare providers and based on my knowledge of her medical condition, that uprooting her and forcibly removing her out of her home environment, which is what will occur when her funds are depleted, would cause her irreparable harm.

Dated at Hartford, Connecticut, this 21st day of April, 2004.

_____
Frances Z. Calafiore

Subscribed and sworn to before me
this 21st day of April, 2004.

_____
Frances Banning
Notary Public

FRANCES M. BANNING
NOTARY PUBLIC
MY COMMISSION EXPIRES APR. 30, 2007

EXHIBIT "B"