# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| MICHELA LEOCATA, THROUGH | : | |
| MATTHEW T. GILBRIDE, ESQ., | : | |
| CONSERVATOR OVER HER ESTATE | : | |
| AND NEXT OF FRIEND | : | CIVIL ACTION NO. 3:02CV1066 (CFD) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF | : | |
| HEALTH AND HUMAN SERVICES, | : | |
| TOMMY THOMPSON, SECRETARY | : | |
| and PATRICIA WILSON-COKER, | : | |
| COMMISSIONER DEPARTMENT | : | |
| OF SOCIAL SERVICES | : | |
| *Defendants* | : | MAY 14, 2004 |

## DEFENDANT COMMISSIONER'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The state Defendant, Patricia Wilson-Coker, Commissioner of the Connecticut Department of Social Services, respectfully submits this memorandum in opposition to the Plaintiff's "Motion for a Temporary Injunction," dated April 26, 2004. By means of her motion, the Plaintiff seeks an order from the court that the defendants "make reasonable accommodation by funding her stay at Arden Courts, (as soon as her estate is exhausted), while this matter is pending before the Court, and while on appeal if an appeal is taken by either party." ("Plaintiff's Memorandum of Law in Support of her Motion for a Temporary Injunction", p. 1. (hereinafter, "Plaintiff's Memorandum").)

A preliminary injunction is "an extraordinary and drastic remedy which should not be routinely granted." Medical Society of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977). As set forth below, the Plaintiff cannot meet the standard applicable to her request for a

preliminary injunction, and, therefore, she is not entitled to this "extraordinary and drastic remedy." Accordingly, her motion should be denied.

## STATEMENT OF FACTS

This action was brought on June 19, 2002, by the Plaintiff, Michela Leocata, through the Conservator of her Estate and Next of Friend, Matthew Gilbride, against Patricia Wilson-Coker, Commissioner of the Department of Social Services of the State of Connecticut (the "Commissioner") and Tommy G. Thompson, Secretary of the United States Department of Health and Human Services (the "Secretary"). Both defendants have been sued in their official capacities with respect to their roles in administering the Title XIX ("Medicaid") program.

The Plaintiff currently resides at Arden Courts, in Farmington, Connecticut, a managed residential community, where she receives services from an assisted living services agency.[1] (Complaint, ¶ 2.) She suffers from advanced dementia but is in otherwise good physical health. (Complaint, ¶ 2.) The Plaintiff is currently using her private funds to pay for the cost of Arden Courts. At the time that she filed her complaint, the Plaintiff estimated that she could afford to stay at Arden Courts using her own funds for approximately two more years.. (Complaint, ¶ 4.) The Plaintiff did not set forth in her complaint her actual monthly costs for room, board, core services, and assisted living services at Arden Courts, but by way of her Conservator's appended affidavit, claims in the instant motion that her monthly expenses are approximately $4,500.00.

---

[1] Although the Plaintiff's Complaint refers to Arden Courts as an "assisted living facility," the State of Connecticut does not actually license assisted living *facilities*. Rather, pursuant to Conn. Gen. Stat. § 19a-490 and Regs. of Conn. State Ag. § 19-13-D105, the State of Connecticut permits managed residential communities ("MRCs") that offer certain "core services" to also offer "assisted living services" via an "assisted living services agency" ("ALSA"). MRCs must be registered with, but are not licensed by, the Department of Public Health. ALSAs are licensed and inspected by the Department of Public Health *See* Regs. of Conn. State Agencies. §§ 19-D13-D105(b),(c).

The Plaintiff alleges that when her private funds are exhausted, she will have no means of paying Arden Courts and she will have to transfer to a nursing facility where her care, including room and board, could be covered by the Title XIX ("Medicaid") program. (Complaint, ¶¶ 7-10.) The Plaintiff further alleges that in the State of Connecticut, the Medicaid program does not cover services provided by an ALSA, in violation of her constitutional rights.  (Complaint, ¶ 7.)

The Plaintiff claims that the total cost of care, room and board at a nursing facility will be higher than at Arden Courts, and that she receives more appropriate care from the ALSA at Arden Courts than she will at a nursing facility.  She further claims that in order for her to have her care covered by the Medicaid program in the State of Connecticut, she will have to move out of Arden Courts and into a nursing facility, thereby violating her constitutional rights.   She seeks declaratory relief pursuant to 42 U.S.C. § 1983, the Due Process clause of the Fifth Amendment, and the Due Process and Equal Protection clauses of the Fifth and Fourteenth Amendments. Specifically, she seeks an order from this court ordering the Defendants to "allocate funds, pursuant to the Medicaid program under Title XIX, as administered by the State of Connecticut, to pay for her care at Arden Courts as soon as her private estate is unable to make payment."

In response to the Plaintiff's complaint, both the state and federal defendants filed Motions to Dismiss, arguing that the Plaintiff's complaint should be dismissed in its entirety because the Plaintiff lacks standing to bring this action and because she has failed to state a claim upon which relief can be granted.  Those motions were argued on September 19, 2003.  The Court has not yet ruled on those motions.

At the end of the parties' arguments on the Motion to Dismiss, the Plaintiff, through counsel, orally requested permission from the Court to amend her complaint to include claims of violations of Americans With Disabilities Act ("ADA") under Olmstead v. L.C. ex rel Zimring,

527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed. 2d 540 (1999). Both defendants objected to the request. This Court did not act on the Plaintiff's request. The Plaintiff never thereafter submitted a written motion for leave to amend her complaint, or a proposed amended complaint.

Now, nearly two years after filing her complaint, the Plaintiff has filed the instant "Motion for a Temporary Injunction," in which she alleges that her monthly expenses are approximately "$4,500.00" per month, and that she expects to exhaust her private funds "in the next few months." (Plaintiff's Memorandum, p. 2.) The Plaintiff repeats her claims of violations of her constitutional right to Equal Protection and Due Process, and also includes as grounds for the requested injunction certain claims under the Americans With Disabilities Act ("ADA"), but has never properly moved to amend her complaint to include such claims, and has not been granted permission by this Court to so amend her complaint.

**ARGUMENT**

**I.    Applicable Standard For A Preliminary Injunction**

The Plaintiff refers in their Memorandum to the standard that generally applies to an application for a preliminary injunction, i.e., the party seeking the injunction must establish irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits of the claim as to make it fair ground for litigation, and the balance of the hardships tips decidedly in favor of the movant. (Plaintiff's Memorandum, p. 4.) Due to the nature of the Plaintiff's action and the relief requested, however, she must in fact satisfy a more difficult standard and cannot rely on the "fair ground for litigation" test.

"When seeking a preliminary injunction that will affect 'government action taken in the public interest pursuant to a statutory or regulatory scheme,' the moving party must show: (1) 'it will suffer irreparable harm' absent the injunction and (2) 'a likelihood of success on the

merits.'" <u>Rodriguez v. DeBuono</u>, 175 F.3d 227, 233 (2d Cir. 1998)(citation omitted). Additionally, where a requested injunction will alter, rather than maintain, the status quo, "the movant must show 'clear' or 'substantial' likelihood of success." <u>Id</u>. In <u>Rodriguez</u>, Medicaid enrollees initiated a class action seeking a preliminary injunction to mandate that safety monitoring be included as part of Medicaid's program for personal home care providers. Because the lawsuit challenged governmental action, the Second Circuit found that the higher standard for preliminary injunctions was applicable and that the plaintiffs had failed to demonstrate irreparable harm.

As was the case in <u>Rodriguez</u>, the plaintiffs in the instant action are challenging "government action taken in the public interest pursuant to a statutory or regulatory scheme," i.e., that, "in the State of Connecticut, the Medicaid program does not currently cover services provided by an ALSA." (Plaintiff's Memorandum, p. 2.)  In her complaint, the Plaintiff concedes that the status quo is that "the relevant state and federal statutes and administrative regulations do not allow benefits to be paid to "assisted living" facilities, but only to "skilled nursing care" facilities, more commonly referred to as nursing or convalescent homes.. (Plaintiff's Complaint, ¶ 7.)  Thus, by requesting that Medicaid benefits be paid to Arden Courts pending the Court's ruling on the Motion to Dismiss, and throughout any subsequent appeal period, the Plaintiff is seeking to alter what she concedes to be the status quo by means of her Motion for a Preliminary Injunction. Applying controlling case law to the specifics of the Plaintiff's Complaint and Motion for a Preliminary Injunction, it can only be concluded that the Plaintiff is required to meet the higher standard of a substantial or clear showing of likelihood of success on the merits in order to obtain preliminary relief.

## II.    The Plaintiff Cannot Establish a Clear and Substantial Likelihood of Success on the   Merits

The crux of the Plaintiff's demand for injunctive is that because the State of Connecticut's Medicaid program does not cover assisted living services, she will be forced, in violation of her constitutional rights, to move out of Arden Courts to a nursing home when her private funds are exhausted.  While the Plaintiff presents a sympathetic case, she cannot establish the requisite clear and substantial likelihood of success on the merits, because the pertinent statutory scheme does not permit the coverage she seeks, and, further, because she lacks standing to bring the claims she has raised.

### A.    The Medicaid Program Covers "Medical Assistance", Not Room And Board

The Medicaid Program, established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*., is a jointly funded state and federal program that pays for necessary medical care for qualifying low-income individuals.  States need not participate in Medicaid, but if they do, they must comply with Title XIX requirements and implementing regulations. States participating in Medicaid must administer the program based on a state plan approved by the Center for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"). 42 U.S.C. § 1396(a); 42 C.F.R. § 430.10. Failure to conform a state plan to federal requirements or to administer the plan in conformity with them may result in a loss of federal funds for the program.  42 U.S.C. § 1396c.

The federal Medicaid statute defines "medical assistance" to include various medical, health, and supportive services.  42 U.S.C. § 1396d(a).  Coverage of certain of these services, such as hospital and nursing facility care, is mandatory for some groups, while other services such as physical therapy, may be provided at the state's option.  42 C.F.R. §§ 440.210-440.225.

Only the mandatory services and optional services included within the state's approved plan may be covered.  42 U.S.C. § 1396c.

The Medicaid program also provides coverage for three basic types of inpatient services, including room and board:  hospitals, nursing facilities, and certain intermediate care facilities for the mentally retarded ("ICF/MR").  42 U.S.C. § 1396d(a)(1),(4),(14),(15),(16).  These facilities must meet both state licensing and federal certification standards in order to receive reimbursement from the Medicaid program.  42 U.S.C. § 1396d(c),(d),(h) and § 1396r; *see also* 42 C.F.R. §§ 440.10(a)(3)(iii), 440.150(a)(3), 441.151(b).   It is crucial to note that Arden Courts is not a facility certified by the Medicaid program, and, therefore, could not accept funding from the Medicaid program even if such relief were ordered by this Court.  (Affidavit, ¶ 10.)

Of  particular relevance to the Plaintiff's complaint is the Medicaid statute's definition of a nursing facility as an institution which

(1)    is primarily engaged in providing to residents

(A)    skilled nursing care and related services for residents who require medical or nursing care,

(B)    rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or

(C)    on a regular basis, health-related care and services to individuals who because of  their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities . . .;

(2)    has in effect a transfer agreement … with one or more [Medicare-certified] hospitals … and

(3)    meets the requirements for a nursing facility described in subsections (b), (c), an (d) of this section [pertaining to the provision of services, residents' rights, sanitation, physical environment, and other matters].

42 U.S.C. § 1396r(a)

To participate in Medicaid, a nursing facility must meet certain certification requirements and is subject to on-site inspections, or "surveys."  42 U.S.C. § 1396r(a)(3); 42 C.F.R. §§ 483.1, *et. seq*.  If, through the results of these surveys, it is determined that a nursing facility no longer meets Medicaid program requirements, various sanctions may be imposed, including termination of the facility's provider agreement, and, hence, termination of participation in the Medicaid program and loss of Medicaid reimbursement.  42 U.S.C. § 1396r(h).

Moreover, "a physician must personally approve in writing a recommendation that an individual be admitted to a facility.  Each resident must remain under the care of a physician." 42 C.F.R. § 483.40  Thus, although the Plaintiff alleges in her complaint that once her funds are exhausted, she will simply move to a nursing facility, she will be unable to do so absent a physician's recommendation, and her Motion for Preliminary Injunction provides no evidence of any such recommendation.  (See attachments to Plaintiff's Memorandum)  A nursing home is an institution, not a housing choice. Furthermore, once admitted to a nursing facility, each resident is thereafter periodically assessed, and the possibility exists that even if initially admitted, a resident could ultimately be discharged.  42 C.F.R. § 483.20

Finally, and perhaps most importantly, just as the Plaintiff presumes that she will meet the medical admission requirements to a nursing home by September, 2004, she also presumes that she will meet the financial eligibility requirements of the Medicaid program by that time. There are a myriad of reasons that the Plaintiff might not, in fact, immediately qualify for Medicaid assistance upon exhausting her liquid assets, such as having made an improper transfer within the applicable statutory lookback period.  The Department of Social Services in fact has no record that the Plaintiff has filed an application for Title XIX services to cover the claimed impending move to a nursing facility.  (Affidavit, ¶ 6.)  Accordingly, it is premature for the

Plaintiff to assume that she would automatically qualify for Medicaid coverage even in a nursing home.

It is true that if she does qualify for Medicaid, the Medicaid program does cover care in a nursing facility, including room and board, for individuals who meet the eligibility requirements. There is no specific reference in the federal Medicaid statute, however, to cover assisted living services. More importantly, the statute neither provides coverage for the residential or room and board component of an assisted living facility, nor, in the more specific case of the state of Connecticut, for the cost of a managed residential care community where ALSA services can be provided. The federal statute also does not establish any certification requirements for such facilities. See State of Texas v. Department of Health and Human Services, 61 F.3d 438, 442 (5th Cir. 1995)(noting that the Medicaid statutory scheme "reveals an intent to use limited Medicaid dollars to pay for room and board expenses only in those facilities for which Congress has extracted the quid pro quo of federal quality assurance standards [i.e., hospitals, nursing facilities, and intermediate care facilities for the mentally retarded].")

In addition to the services set forth in a state's approved state plan, the Secretary has the authority and discretion to grant waivers the furnishing of certain "home or community based" services that would not otherwise qualify as medical assistance under the program,[2] or that would be provided in a manner that would otherwise violate certain Medicaid statutory requirements, but only if such services are furnished to individuals who, but for the provision of such services, would require the level of care provided in a hospital, nursing facility, or ICF/MR. See generally Skandalis v. Rowe, 14 F.3d 173, 176 (2d Cir. Conn. 1994). Home and community based services enable elderly, disabled, or chronically ill persons who would otherwise be

---

[2] The types of health or supportive services that could be included in such a waiver are discussed more extensively in the federal Defendant's Motion to Dismiss.

institutionalized to live in the community.  Significantly, however, the statute precludes a state from including "room and board" as a home and community based service.  *See* 42 U.S.C. § 1396n(c)(1); *See also* 42 U.S.C. § 1396t(a)(9)  and § 1396u(f)(1) (excluding "room and board" from "home and community care" and "community supported living arrangements services".)

Pursuant to the above-cited provisions, a state may receive federal funding under Medicaid for a broad range of personal, supportive, or health services provided to elderly citizens receiving assisted living services. See <u>Senate Report</u>, Attachment A to "Secretary's Memorandum in Support of Motion to Dismiss", pp. 110-111; <u>Mollica</u>, Attachment C to "Secretary's Memorandum in Support of Motion to Dismiss", p. 8 ("Medicaid is very flexible and offers states an array of options for setting eligibility and covering [assisted living] services.")  As noted above, a state may provide these services under its state plan or under a home and community based waiver.  Most states that offer Medicaid coverage for assisted living services do so through the waiver option.  <u>Senate Report</u>, *supra*, at p. 110; <u>Mollica</u>, *supra*, at p. 8. Again, however, the coverage that is available would be for assisted living services, not for room and board, which is consistent with the Medicaid statute's prohibition of federal funding for assisted living room and board charges.

For example, in the State of Connecticut, assisted living services are defined by the regulations as nursing and assistance with activities of daily living (ambulation, feeding, bathing, dressing, grooming, toileting, oral hygiene, transfers, exercise, and supervision of self administration of medications.)  Regs. of Conn. State Ag. § 19-13-D105(a)(2)(4).  Assuming arguendo, therefore, that the Commissioner could either amend Connecticut's state plan to allow ALSA services to be a covered service, or obtained a waiver allowing for assisted living services to be covered as a home based community service, only the ALSA services would be covered by

the Medicaid program. The room and board and core services provided by managed residential communities such as Arden Courts, which are not licensed or certified, could not be covered by Medicaid because they are neither medical nor support services as defined by the Medicaid statute. In addition to room and board, the core services provided by managed residential communities include meals, transportation, security, call system, linen and laundry services, housekeeping and maintenance, social/recreational programs and on-site service coordinators, none of which would be covered by Medicaid. Regs. of Conn. State Ag. § 19-13-D105(a)(9).

Thus, there is a very minimal "medical" component to assisted living residences in the State of Connecticut. In Connecticut, it is primarily a housing arrangement offering minimal personal assistance and can cost as much as $5,750.00 per month. *See, e.g*., <u>AARP Connecticut Assisted Living Survey</u>, February 2002, p. 2 (attached to "State Defendant's Motion to Dismiss"). Only a small portion of this monthly charge, therefore tends to be for actual ALSA charges. See <u>OLR Research Report: Financial Assistance For Assisted Living</u>, Nov. 28, 2001, p.2 (attached to "State Defendant's Motion to Dismiss"). (Noting that "average annual rent range[s] between roughly $18,000.00 and $30,000.00 for a small studio to between $41,000 and $45,000 for a more luxurious two-bedroom apartment. The rent … covers room and board, activities, some housekeeping, transportation, and minimal other services. The actual assisted living services can add another $4,800 to $12,000 a year to the total cost.")

As noted in the State Defendant's Motion to Dismiss, in the year 2002, the State of Connecticut, the legislature approved an extremely limited assisted living pilot project, to be administered by the Commissioner with a start date on or after January 1, 2003. (Copy of enabling legislation, P.A. 02-7, §§ 27, 28 attached to "State Defendant's Motion to Dismiss"). These pilot projects do not appear to have any impact on the Plaintiff's claims because

participants in the pilot programs must already be eligible for services under either the existing home based community Medicaid waiver or the state funded portion of the Connecticut Home Care for the Elderly program established under Conn. Gen. Stat. § 17b-352, and it does not appear from the face of the complaint that the Plaintiff meets either of these requirements. Further, Arden Courts is not one of the managed residential communities participating in the project, nor does the Department have any record that the Plaintiff has applied to participate in the project even at another managed residential community.[3] (*See* Affidavit, ¶¶ 6-10.)

Most importantly, in any event, the pilot program pays only for ALSA services, not for the cost of room and board or other core services provided by the MRC.  Even if the Plaintiff could obtain some funding from the pilot program for the assisted living services she receives at Arden Courts, she would remain responsible for most of the charges as they are likely to be for core services (including room and board) and not ALSA services, because under the waiver, Medicaid cannot pay for room and board outside of an institution.  42 C.F.R. § 441.360(b); Affidavit.   None of the affidavits attached to the Plaintiff's Memorandum break down which portion of her purported $4,500 monthly charge[4] at Arden Courts is actually for assisted living services, and which portion is for room and board and other "core services."

### B.    The Plaintiff Lacks Standing

"The question of  standing  is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed. 2d 343 (1975).  Since the  standing  requirement is  derived from Article  III  limitations

---

[3] It should be noted that Plaintiff has in fact submitted no evidence that less costly living arrangements in the community are not available to her.

[4] It should also be noted that the Plaintiff has not submitted any actual documentation from Arden Courts to substantiate her claimed monthly expenses.

on the federal courts' powers, it is the threshold issue in every case. To demonstrate standing a plaintiff must establish first that he has suffered some "distinct and palpable injury." Gladstone, Realtors v. Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed. 2d 66 (1979), *quoting* Warth, *supra*, 422 U.S. at 490, 501, Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed. 2d 184 (1970). Second, the injury must be the result of the "putatively illegal conduct of the defendant." Gladstone, *supra*, 441 U.S. 91 at 99. In other words, plaintiff must show that the injury "fairly can be traced to the challenged action." Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 41, 96 S.Ct. 1917, 48 L.Ed. 2d 450 (1976). Nor may the causation between the illegal conduct and the injury be too attenuated. Allen v. Wright, 468 U.S. 737, 750-52, 104 S.Ct. 3315, 3324-25, 82 L.Ed. 2d 556 (1984). Finally, it must be likely that plaintiff's injury will be redressed by a favorable court decision. Valley Forge Christian College v. Americans United for Seperation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed. 2d 700 (1982).

In addition to the Article III standing requirements, there are judicially-created prudential policy limitations on the exercise by a federal court of judicial power. *See e.g*., Allen v. Wright, *supra*, 468 U.S. 737 at 750.

These judicially self-imposed limits prevent a litigant from resting his claim to relief on the legal rights of some third party, and bar adjudication of abstract questions that, although perhaps of wide public significance, really amount to no more than generalized grievances. *Id*. They also require plaintiff's complaint to fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Organizations, *supra,* 397 U.S. 150 at 153.

The Plaintiff in the instant case does not satisfy the three-part so-called "injury-in-fact" test set forth above and does not have standing to maintain this action.  At most, the Plaintiff alleges the threatened harm of having to leave Arden Courts and move into a nursing facility when her funds are exhausted. (Complaint, ¶¶ 8-10.)   However, the Plaintiff has been able to stay at Arden Courts for nearly two years since filing her Complaint; she has not demonstrated that she qualifies for admission to a skilled nursing facility; and she has not demonstrated that she will be eligible for Medicaid benefits when the funds referenced in her Complaint are exhausted.  (Affidavit, ¶¶ 6-7.)  In addition, other than expressing a strong personal preference, the Plaintiff has failed to demonstrate that a nursing facility would be an inappropriate placement for her at any time in the future.   It is impossible for any individual, particularly an individual such as the Plaintiff who is elderly and has been diagnosed with Alzheimer's, to concisely and accurately predict their future health care needs.  Finally, and perhaps most importantly, she has not applied for or been denied Medicaid benefits for care in any setting.  (Affidavit, ¶ 6.)

Consequently, the Plaintiff has failed to demonstrate any actual injury,.  Moreover, since the threatened injury will not occur for at least several months, if at all,  it can hardly be qualified as imminent or impending so as to invoke the Article III jurisdiction of this court.  *See e.g.* Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109  L.Ed. 2d 135 (1990) (holding that to satisfy the injury-in-fact test, the threatened injury must be "certainly impending;" a "possible future injury" is insufficient.)  City of Los Angeles v. Lyons, 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed. 2d 675 (1983) (A plaintiff must show that he has "sustained or is immediately in danger of sustaining some direct injury.")

 Finally, the Plaintiff has failed to satisfy the redressability requirement of Article III standing.  The Plaintiff assumes that, if the Medicaid program is required to reimburse ALSA

services to the same extent that nursing facility care is covered, she would be able to remain at Arden Courts indefinitely.  First, again, she assumes that she will not, in the foreseeable future, need a higher level of care than ALSA services. She may in fact, within a short period of time, need a level of care higher than the basic nursing and assistance with activities of daily living provided by ALSAs[5].  Second, as discussed above, even if ALSA services were reimbursed by Medicaid, the rental and other fees for the core services she receives from the managed residential community component of Arden Courts do not qualify for Medicaid reimbursement. Finally, even if the rate of reimbursement were not an issue, there is no guarantee that Arden Courts would either elect to enter into a provider agreement with the Commissioner and the Secretary, or that Arden Courts would be able to meet any forthcoming applicable certification requirements.

It is clear from the Plaintiff's Complaint that the she would rather live at Arden Courts than a nursing home.  However, as the Connecticut Supreme Court once noted in reviewing a Medicaid appeal: "[S]ympathy is an insufficient basis for a recovery based on a theory inconsistent with the law.  A reviewing court may not ignore federal regulations simply because it interprets [the Social Security Act] in manner it considers preferable to the Secretary's interpretation."  (Internal quotation marks and citations omitted.)  Clark v. Commissioner, 209 Conn. 390, 406, 551 A.2d 729 (1988).  That court continued: "'T[he] legislature recognized the primacy of the applicable federal provisions and this court must be guided by those provisions. Stated in another way, the federal statutes and regulations set a limit upon the authority of the

---

[5] In fact, in Connecticut, only individuals whose conditions are "chronic and stable" may reside in managed residential communities and receive ALSA services. Regs. Conn. Agencies § 19-13-D105(e)(7); ALSAs are in fact mandated to discharge individuals who have a change in condition and are no longer "chronic and stable."  Regs. Of Conn. State Ag. § 19-13-D105(e)(9)(A).  It should also be noted that "termination of services when the client's insurance benefits or financial resources have been exhausted" is another grounds for discharge under the regulations.  § 19-13-D105(e)(9)(D)

commissioner as well as furnishing a guide to his administration of the program.' <u>Morgan v. White</u>, 168 Conn. 336, 343-44, 362 A.2d 505 (1975)." <u>Clark</u>, *supra*, 209 Conn. 390 at 396-97.

For these reasons, the Plaintiff lacks standing to maintain this action and injunctive relief is not appropriate.

### C.    The Plaintiff Fails to State A Claim Upon Which Relief Can Be Granted.

Even if the Plaintiff could surmount the jurisdictional obstacles raised by Article III, she is nonetheless unlikely to prevail on her claims.

The Plaintiff seeks declaratory relief pursuant to 42 U.S.C. § 1983.  She claims that the defendants' failure to cover the cost of her care at Arden Courts under the Medicaid program violates her rights under the due process clause of the Fifth Amendment, and the due process and equal protection clauses of the Fifth and Fourteenth Amendments.  In seeking injunctive relief, she has raised claims under the ADA that are not set forth in her complaint.

### 1.    42 U.S.C. § 1983

The Social Security Act, including Title XIX, does not afford a private cause of action against a state.  <u>Edelman v. Jordan</u>,  415 U.S. 651, 673-74, 94 S.Ct. 1347, 1361, 39 L.Ed. 2d 662, 679 (1974) *rehearing denied* 416 U.S. 1000, 94 S.Ct 2414, 40 L.Ed. 2d 777 (1974).  The only possible basis for subject matter jurisdiction in her claims against the Commissioner would be an enforcement of federal rights pursuant to 42 U.S.C. § 1983, which provides, in pertinent part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

However, § 1983 does not permit an action against a state official merely because he or she is alleged to be acting in violation of federal law in some way.  Instead, to bring a claim under § 1983, a plaintiff must allege that a defendant is violating a right secured "by the Constitution and laws" of the United States.  The Plaintiff here does not claim any statutory violation, but  merely asserts that because the Commissioner administers the Medicaid program for the state of Connecticut, and because the Medicaid program covers skilled nursing in a nursing facility but not assisted living, her constitutional rights of equal protection and due process have been violated.  This is insufficient to state a § 1983 claim upon which relief can be granted.

### a. The Statutory Classification Challenged By the Plaintiff Does Not Offend the Equal Protection Clause.

The Plaintiff's claim with respect to the equal protection clauses of the Fifth and Fourteenth Amendments appears to be that because the federal government and the state of Connecticut[6] have provided Medicaid funding for nursing facility room and board charges, but not for assisted living services at managed residential communities, her equal protection rights have been violated.  The Plaintiff is highly unlikely to prevail on this claim for the following reasons.

---

[6] As discussed above, Connecticut's limited pilot project with respect to assisted living is irrelevant to this case because the Plaintiff has not applied to participate in the project; might not qualify so participate; and also because the pilot project specifically excludes the rental and other costs of the managed residential community.

The equal protection clause requires that people similarly situated be treated similarly. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed. 2d 313 (1985); Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. N.Y. 1995). The Equal Protection Clause of the Fourteenth Amendment does not create any new or substantive legal rights, but simply stands for the proposition that the laws existing in any state should be held and enjoyed alike by all persons within its jurisdiction. It is not meant to restrain the normal exercise of governmental power, but rather to constrain the state from indulging in hostile or partial discrimination against a class or person. Louisville & N.R. Co. v. Malton, 218 U.S. 36, 52, 30 S.Ct. 676, 54 L.Ed. 2d 921 (1910).

The Plaintiff has not challenged any state law as creating an illegal classification. Fetterusso v. New York., 898 F.2d 322, 325 (2d. Cir. N.Y. 1990). In order for the Plaintiff to demonstrate that her right to equal protection was violated, she would have to establish that she was treated differently from other individuals in her circumstances. Brandon v. District of Columbia Bd. of Parole, 823 F.2d 644, 650 (D.C. Cir. 1987). See also Pryor-El v. Kelly, 892 F.Supp. 261, 269 (D.C. Cir. 1995). Second, she must demonstrate that such unequal treatment was the result of intentional discrimination. Allen v. Cuomo, 100 F.3d 253, 261 n.1 (2d Cir. N.Y. 1996). Even if the Plaintiff were able to demonstrate these two predicates, the court then only examines the government's actions under rational basis review. Id. "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." Buckley v. Valeo, 424 U.S. 1, 93, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)

The Plaintiff has failed to meet either of the necessary criteria in order to state an equal protection claim. She fails to even allege in her complaint that she is or will be treated differently than similarly situated individuals. Nor is there any allegation that the plaintiff was

intentionally discriminated against by the Commissioner.  In fact, the Plaintiff specifically alleges that similarly situated individuals do in fact face the same treatment:  "Other individuals, such as [the Plaintiff], who do not need skilled nursing care, because they are otherwise physically healthy, but who cannot live alone due to their suffering from dementia, are involuntarily forced to enter a nursing or convalescent home ...."   (Complaint, ¶ 8.) Accordingly, injunctive relief is not warranted.

<blockquote>

**b.  The Statutory Classification Challenged By the Plaintiff Does Not Challenge the Due Process Clause**

</blockquote>

The Plaintiff is also unlikely to prevail on her claim that her due process rights have been violated by the fact that Medicaid covers nursing home care but not assisted living residences.

Substantive due process under the  Fifth Amendment  bars certain arbitrary, wrongful government actions regardless of their procedural fairness. Conway v. Searles, 954 F. Supp. 756, 770 (D.Vt. 1997). The complainant bears the burden of showing that the legislature, in passing the challenged law, acted in an arbitrary, irrational manner.  Conway v. Sorrell, 894 F. Supp. 794, 803 (D.Vt. 1995) *motion granted sub nom.* 954 F. Supp. 756 (D.Vt. 1997). A plaintiff setting forth a substantive due process claim must show that the government unlawfully interfered with an identified property interest. Interboro Institute, Inc. v. Maurer, 956 F. Supp. 188, 196 (N.D.N.Y. 1997).

To properly state a substantive due  process  claim, a plaintiff must identify a  property interest  and explain how it has been interfered with by the government. *See* Greene v. Town of Blooming Grove, 935 F.2d 507, 510 (2d Cir. N.Y. 1991), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 639, 116 L. Ed. 2d 657 (1991); Brady v. Town of Colchester, 863 F.2d 205, 215 (2d Cir. Conn. 1988);  Reno v. Flores, 507 U.S. 292, 302, 113  S.Ct. 1439, 123 L.Ed. 2d 1 (1993). It is important to note that "substantive due process  protects against government action that is

arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'"  Id.

"[P]roperty interests … are not created by the Constitution."  Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L. Ed. 2d 548 (1972). "Rather they are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlements to those benefits." *Id*.

Presumably, the Plaintiff's claimed property interest here is in Medicaid coverage for care, including room and board, at Arden Courts.  However**,** "[P]ossession of a property interest in a government benefit requires more than an abstract need or desire for it; there must be 'a legitimate claim of entitlement to it.'" *Id*.  (Addressing procedural due process claim.) Here, the Plaintiff cites no state law that would serve as a basis for her claim of entitlement.

Without a valid property interest, the Plaintiff's substantive due process claim cannot succeed.  See, e.g. O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 785, 100 S. Ct. 2467, 65 L. Ed. 2d 506 (1980) (Rejecting attempt of nursing home residents to enjoin transfer to another nursing home after their home was decertified from Medicaid program on basis of violation of fifth amendment due process rights: "Whether viewed singly or in combination, the Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in the home of one's choice.")

As with an equal protection inquiry, the test of a due process claims is whether there is "a legitimate legislative purpose furthered by  rational  means." General Motors Corp. v. Romein, 503 U.S. 181, 191, 112 S.Ct. 1105, 117 L.Ed. 2d 328 (1992).

Here, the federal Medicaid statute, and the Commissioner's administration of it in the State of Connecticut, can clearly survive a substantive due process challenge. As demonstrated by the attachments to the "Secretary's Motion to Dismiss", Congress' desire to conserve federal Medicaid funds by limiting inpatient coverage to recipients with the greatest medical and nursing needs within facilities that meet federal certification standards provides the requisite rational basis for the omission of Medicaid coverage for assisted living in Connecticut. Moreover, the Plaintiff has made no showing that the Commissioner is administering the Medicaid program in the State of Connecticut arbitrarily or outside the scope of federal or state law. Accordingly, the Plaintiff's substantive due process claim does not meet the standard for injunctive relief.

### c.      The Plaintiff Will Not Prevail On Her ADA Claims

In support of her request for an injunction, the Plaintiff includes claims under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, *et. seq.*, and, more specifically, under the United States Supreme Court case, Olmstead v. L.C. ex. Rel. Zimring, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed. 2d 540 (1999). This claim cannot be sustained in light of the United States Supreme Court's ruling in Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 121 S. Ct. 955 (2001), which confirmed that states are immune from ADA claims under the Eleventh Amendment. Nonetheless, even if the Plaintiff could bring an ADA claim against the state defendant, she could not prevail on that claim. Accordingly, the Plaintiff is not entitled to injunctive relief on this claim.

### i.      The ADA Claims Are Not Properly Before This Court

The Plaintiff's purported ADA and Olmstead claims are not properly before this Court because the Plaintiff was never given leave by this Court to amend her complaint to include such claims.

The Plaintiff's request to amend her complaint was made orally, through counsel, during the September 19, 2003 argument on the motion to dismiss. (Plaintiff's Memorandum, pp. 3, 12). Both defendants objected, and the court to date has not taken action on the Plaintiff's requested amendment. Moreover, the Plaintiff has never submitted a written motion for leave to amend the complaint, nor has she submitted a proposed amended complaint. *See* FRCP 15(a).

At least one appellate court has interpreted a district court's lack of response to a requested amendment to be an "implicit denial:" "[T]he district court did not comment on [the plaintiff's] request for leave to amend and therefore implicitly denied it." Gurary v. Winehouse, 235 F.3d 792, 795 (2d Cir. 2000); *see also* Bronx Legal Services v. Legal Services for New York City and Legal Services Corporation, 2003 LEXIS 22280 (2d Cir. 2003) (affirming district court's decision to deny to amend: "[P]laintiff gave the court no reason why it should be entitled to amend. Instead, without offering any proposed amendments, plaintiff simply requested, at the end of its brief in opposition to defendants' motions to dismiss, that they be given an opportunity to replead in the event the motions were granted. Even now, in their appellate briefs, plaintiff does not tell us exactly what it might allege in an amended complaint that would cure the deficiencies in its pleadings. In [these] circumstances . . . we cannot conclude that the district court abused its discretion when it summarily denied an unsubstantiated request for leave to amend."); Rosendale v. Arleneiuliano, 2003 LEXIS 9638 (2d Cir. 2003)(noting that "[w]ithout a proposed pleading, the district court could not determine whether [the proposed amended] claim could survive a motion to dismiss, whether it was futile, or whether it was frivolous.").

Further, for the reasons discussed more fully below, any attempt by the Plaintiff to amend her complaint to include ADA/Olmstead claims would be futile. *See, e.g.,* Henry v. Dept. of

Transportation et al., 2003 LEXIS 12932 (2d Cir. 2003); Beyer Farms, Inc. v. Elmhurst Dairy, Inc., 2002 LEXIS 13209 (2d Cir. 2002).

Therefore, since no leave to amend the complaint has been granted; since no proposed amended complaint has even been submitted to set forth those specific claims; and since any such amendment would be futile, this Court cannot properly consider the Plaintiff's Olmstead and ADA claims in ruling on Plaintiff's Motion for a Temporary Injunction.

**ii.     Even if the Plaintiff's Olmstead Claims Were Properly Before This Court,  Those Claims Would Fail**

As noted above, the United States Supreme Court has ruled that states are immune from claimed violations under the ADA.  Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 121 S. Ct. 955  (2001)

Even if this Court could, however,  allow the Plaintiff to include the ADA/Olmstead claims alluded to in Plaintiff's Motion for a Temporary Injunction, the Plaintiff  could not show the requisite clear and substantial likelihood of success on the merits so as to warrant injunctive relief.

The gist of the Plaintiff's proposed ADA/Olmstead claims, as set forth in her Motion in Support of Temporary Injunction, appears to be that the failure of the defendants to provide Medicaid funding for Arden Courts violates the "reasonable accommodation" requirements of Title II of the ADA and, further, that her relocation to a nursing home (where the Plaintiff may qualify for Medicaid assistance) constitutes "unnecessary institutionalization" in violation of Olmstead.  Essentially, the Plaintiff argues that it is somehow discriminatory to provide Medicaid funding for skilled nursing facilities but not assisted living residences, and that if she is

forced to move to a nursing home when her assets are depleted, this constitutes unnecessary institutionalization. Plaintiff's reasoning is flawed and these claims would fail.

Pursuant to the ADA,

[n]o qualified individual with a disability shall, by reason of such disability, be … denied the benefits of the services [or] programs … of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. §12132.

For purposes of the ADA, a "qualified individual with a disability" is one who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. 12131(2).

In the Olmstead case, the United States Supreme Court examined whether the State of Georgia's refusal to provide services to mentally disabled persons in "community settings," instead of institutions, violated the ADA. The Court held that such action would violate the ADA only

when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

Olmstead, supra, 119 S.Ct. at 2181.

Claims similar to the Plaintiff's were unsuccessfully pursued in this Circuit prior to the Supreme Court's ruling in Garrett. In Rodriguez v. City of New York, 197 F.3d 611 (2d Cir. 1999), the plaintiffs claimed, inter alia, that it was a violation of the ADA for the state to provide certain personal care services to Medicaid recipients, but not safety-monitoring services:

Appellees are members of a class that are eligible to receive Medicaid and who suffer from mental disabilities – such as Alzheimer's disease – that cause them to require assistance with daily living tasks. They have received personal care services but allege that, without the provision of safety monitoring as an

> independent service, the services provided are inadequate to meet their medical
> needs and to allow them to continue living in their homes . . . . Appellees argue
> that safety monitoring is comparable to the other personal care services that New
> York does provide and that they cannot remain in their homes without it. They
> claim that this omission constitutes unlawful discrimination against otherwise
> eligible, mentally disabled patients.

Rodriguez, *supra*, 197 F.3d at 614.

In overturning the district court's granting of the plaintiff/appellee's permanent injunction, the Second Circuit in Rodriguez noted that while Section §1396a(a)(10)(B) of the Medicaid Act mandates that "medical assistance made available to any individual … shall not be less in amount, duration or scope than the medical assistance made available to any other such individual," this section "does not require a state to fund a benefit that it currently provides to no one. Its only proper application is in situations where the same benefit is funded for some recipients but not others." Id. at 616 (internal citations omitted). The Court further noted that "[b]ecause New York's program does not impermissibly discriminate under Section 1396a(a)(10)(B), New York may prevail simply by showing that the decision not to include safety monitoring as an optional benefit was reasonable. … Moreover, the federal Health Care Financing Agency, which is responsible for administering the Medicaid program – informed New York that its decision was not only reasonable but proper: …[T]he supervising/monitoring of an individual, by itself, without the provision of personal care services, would not be considered personal care services for Medicaid purposes." Id. at 616-17 (internal citations omitted.)

The Second Circuit also rejected the plaintiff's argument that "the purpose of the personal care services [benefit] is to enable recipients to reside in their homes, and their argument goes, because safety monitoring enables appellees to remain at home, it must be provided. This analysis is, however, at the incorrect level of generality. Instead of examining

the particular need addressed by a particular service, it focuses on the presumed purpose of an entire package of personal care services.  This approach is contrary to the text of the regulation and to the purpose of the Medicaid Act."  Id.  at 617.

Finally, and most importantly to the disposition of the instant Plaintiff's claim, the Rodriguez court squarely rejected the plaintiff's ADA claim: "The ADA requires only that a particular provided to some not be denied to disabled people. … Hence, what the appellees are challenging is not illegal discrimination against the disabled, but the substance of the services provided."  Id. at 618.

The Rodriguez court in fact emphasized that "In Olmstead, the parties disputed only – and the Court addressed only – *where* Georgia should provide treatment, not *whether* it must provide it. … Olmstead does not, therefore, stand for the proposition that states must provided disabled individuals with the opportunity to remain out of institutions.  Instead, it holds only that States must adhere to the ADA's nondiscrimination requirement with regard to the services *they in fact provide* …  Appellees want New York to provide a new benefit, while Olmstead reaffirms that the ADA does not mandate the provision of new benefits."  Id. at 619.  (Emphasis in original.)

The Second Circuit came to a similar conclusion in another case, Wright v. Giuliani et al., 230 F.3d 543 (2d Cir. 2000).  In Wright, five individuals who had been diagnosed with HIV and/or AIDs brought suit on behalf of themselves and a putative class, alleging that various officials of the City of New York had failed to provide them with emergency housing that accommodated their disability.

The municipal benefit program at issue in Wright provided "medically appropriate transitional and permanent housing" to "every eligible person with clinical/symptomatic HIV

illness or with AIDs who requests assistance." <u>Id.</u>, at 545.   In affirming the district court's

denial of a preliminary injunction, the Second Circuit noted that

> The district court construed Circuit precedent to require that in any Rehabilitation
> Act or ADA analysis, "courts must focus on the specific services provided to the
> able-bodied and compare them to the services provided to the disable."  The court
> emphasized that the Rehabilitation Act and the ADA guarantee no specific
> benefits; they require only that "the particular benefits provided to the able-bodied
> be meaningfully accessible to the disabled."

<u>Id</u>., at 547.

The <u>Wright</u> court further noted that "[the] distinction between affording (i) 'meaningful

access' through 'reasonable accommodation' and (ii) 'additional substantive benefits' is crucial

to the merits of this case. ...." <u>Id.</u>, at 548.  The <u>Wright</u> court then discussed other Second Circuit

decisions, including <u>Rodriguez</u>, and concluded that

> [t]he thrust of these cases is that the disabilities statutes do not require that
> substantively different services be provided to the disabled, no matter how great
> their need for the services may be.  They require only that covered entities make
> 'reasonable accommodations' to enable 'meaningful access' to such services as
> may be provided, whether those services are adequate or not.

<u>Id</u>.

Finally, the <u>Wright</u> court concluded that the district court in that case properly denied the

requested injunction because there was inadequate evidence that the plaintiffs were seeking

"reasonable accommodations" as opposed to "additional, substantive benefits."  <u>Id</u>

In the instant case, as in <u>Rodriguez</u> and <u>Wright</u>,  Medicaid funding is not provided to

*anyone* in the state of Connecticut for assisted living residences.[7]  The Plaintiff cannot, therefore,

claim that such funding is being withheld from her on a discriminatory basis.  In fact, given that

room and board cannot be covered by Medicaid, her claim is indeed one for an "additional

---

[7] With the exception of those individuals participating in the state's pilot program, *infra*,  (where Medicaid funding
is provided only for ALSA services, *not* for "room and board" and other "core services," which in fact constitute the
bulk of the monthly expenses.

substantive benefit," proscribed by <u>Wright</u>, rather than a claim for a reasonable accommodation for a disability.

Accordingly, the Plaintiff would not be entitled to injunctive relief on these claims even if they could be entertained by this court.

### III.     The Plaintiffs Cannot Establish That They Would Suffer Irreparable Harm In The Absence Of A Preliminary Injunction

The other essential element in satisfying the preliminary injunction standard is irreparable harm. "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." <u>Shapiro v. Cadman Towers, Inc</u>., 51 F.3d 328, 332 (2d Cir. 1995). "In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." <u>Rodriguez v. DeBuono</u>, *supra* at 234. As was the case with the requirement of a showing of clear and substantial likelihood of success on the merits, the Plaintiff cannot make a showing of irreparable harm such that the issuance of a preliminary injunction against the federal and state Defendants would be warranted.

Although the Plaintiff alleges that she will be subjected to irreparable injury unless this Court issues a preliminary injunction requiring Medicaid payment for Arden Courts by the Defendants, it is significant that she did not seek a preliminary injunction until a considerable time had elapsed from the filing of her complaint and the arguments on the motions to dismiss.

Moreover, even assuming the Plaintiff's motion were timely filed, she has not demonstrated any impending "distinct and irreparable injury," and certainly not one so imminent as to warrant an injunction. (*See infra* at pp. 12-15.)

In <u>Hassan v. Slater</u>, 41 F.Supp. 2d 343 (E.D.N.Y. 1999), the plaintiff, who alleged he was a disabled person, sought a preliminary injunction in relation to the closure of a particular train station in Long Island, New York.  The court denied the preliminary injunction motion, in part because of the plaintiff's delay (nearly one year from announcement of the decision to close the station) in filing it.  "'The Second Circuit has observed that "preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action .... Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate absence of the kind of irreparable harm required to support a preliminary injunction.'"  <u>Id</u>. at 349.

The considerable delay between  the filing Plaintiff's complaint and her filing of a motion seeking a preliminary injunction undercuts the Plaintiff's argument that she will suffer irreparable harm in the absence of a preliminary injunction.  It should also be noted in that regard that during this intervening period,  the Plaintiff does not appear to have applied for Title XIX assistance, so it is unknown if she even qualifies for benefits.  (Affidavit, ¶¶ 6-7.)  There is also no evidence that the Plaintiff has inquired about the state's pilot program, or that she has explored other options for residing in the community.   (Affidavit, ¶ 9; Plaintiff's Complaint; Plaintiff's Memorandum.)   Finally, it must be noted that Plaintiff is claiming potential harm by the deprivation of a benefit that simply does not exist.  All of these considerations lead to the conclusion that  she has failed to make a sufficient showing of irreparable harm to justify the issuance of a preliminary injunction against the state and federal defendants.

**<u>CONCLUSION</u>**

For the foregoing reason, Plaintiff's "Motion for a Preliminary Injunction" should be denied.

                                    DEFENDANT
                                    PATRICIA WILSON-COKER
                                    COMMISSIONER OF DEPARTMENT OF
                                    SOCIAL SERVICES

                                    RICHARD BLUMENTHAL
                                    ATTORNEY GENERAL

                                    Richard J. Lynch
                                    Assistant Attorney General

BY:    /s/_____
                                    Tanya Feliciano DeMattia
                                    Assistant Attorney General
                                    Federal Bar No ct  14996
                                    55 Elm Street, P.O. Box 120
                                    Hartford, CT  06141-0120
                                    Tel: (860) 808-5210
                                    Fax: (860) 808-5385
                                    tanya.feliciano@po.state.ct.us

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing <u>Defendant Commissioner's Opposition To</u>

<u>Plaintiff's Motion For A Preliminary Injunction</u> was mailed in accordance with Rule 5(b) of the

Federal Rules of Civil Procedure on this 14th day of May, 2004, first class postage prepaid to:

Raymond J. Rigat, Esq.
Gilbride & Rigat
23 East Main Street
Clinton, CT 06413

Carolyn A. Ikari
Assistant U.S. Attorney
450 Main Street, Room 328
Hartford, CT 06103

Clifford M. Pierce
Assistant Regional Counsel
Department of Health and Human Resources
J.F.K. Building, Room 2250
Boston, MA 02203

/s/_____
 Tanya Feliciano DeMattia
 Assistant Attorney General
 Federal Bar No. ct14996