## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

MICHELA LEOCATA, THROUGH :
MATTHEW T. GILBRIDE, ESQ., :
CONSERVATOR OVER HER ESTATE :
AND NEXT OF FRIEND : CIVIL ACTION NO. 3:02CV1066 (CFD)
    *Plaintiff* :
     :
      v. :
     :
UNITED STATES DEPARTMENT OF :
HEALTH AND HUMAN SERVICES, :
TOMMY THOMPSON, SECRETARY :
and PATRICIA WILSON-COKER, :
COMMISSIONER DEPARTMENT :
OF SOCIAL SERVICES :
    *Defendants* : July 15, 2004

### MEMORANDUM IN SUPPORT OF
### STATE DEFENDANT'S MOTION TO DISMISS

### STATEMENT OF FACTS

This action was brought by the Plaintiff, Michela Leocata, through the Conservator of her

Estate and Next of Friend, Matthew Gilbride, against Patricia Wilson-Coker, Commissioner of

the Department of Social Services of the State of Connecticut (the "Commissioner") and Tommy

G. Thompson, Secretary of the United States Department of Health and Human Services (the

"Secretary"). Both defendants have been sued in their official capacities with respect to their

roles in administering the Title XIX ("Medicaid") program.

On July 14, 2004, this court granted the Plaintiff leave to amend her original complaint to

include an allegation of a violation of Title II of the Americans With Disabilities Act ("ADA").

Motions to dismiss the original complaint were argued on September 19, 2003, but had not been

decided prior to the Plaintiff's motion to amend his complaint. In addition, the Plaintiff has

moved for a preliminary injunction, which will be argued on July 19, 2004.

The Plaintiff currently resides at Arden Courts, in Farmington, Connecticut, a managed residential community, where she receives services from an assisted living services agency.[1] (Complaint, ¶ 2)  She suffers from advanced dementia but is in otherwise good physical health. (Complaint, ¶ 2)  The Plaintiff is currently using her private funds to pay for the cost of Arden Courts, and expects that she will be able to do so until approximately the fall of 2004. (Complaint, ¶ 4.)  The Plaintiff does not set forth in her amended complaint her actual monthly costs for room, board, core services, and assisted living services at Arden Courts.

The Plaintiff claims that when her private funds are exhausted, she will have no means of paying Arden Courts and she will have to transfer to a nursing facility where her care, including room and board, could be covered by the Title XIX ("Medicaid") program.  (Complaint, ¶¶ 7-10.)  The Plaintiff alleges that in the State of Connecticut, the Medicaid program does not cover services provided by an ALSA.  (Complaint, ¶ 7.)

The Plaintiff claims that the total cost of care, room and board at a nursing facility will be higher than at Arden Courts, and that she receives more appropriate care from the ALSA at Arden Courts than she will at a nursing facility.  She further claims that in order for her to have her care covered by the Medicaid program in the State of Connecticut, she will have to move out of Arden Courts and into a nursing facility, in violation of her constitutional rights and Title II of the ADA.  She seeks declaratory relief pursuant to 42 U.S.C. § 1983, the Due Process clause of the Fifth Amendment, the Due Process and Equal Protection clauses of the Fifth and Fourteenth Amendments, and Title II of the ADA.  Specifically, she seeks an order from this court ordering

---

[1] Although the Plaintiff's Complaint refers to Arden Courts as an "assisted living facility," the State of Connecticut does not actually license assisted living *facilities*.  Rather, pursuant to Conn. Gen. Stat. § 19a-490 and Regs. Of Conn. State Ag. § 19-13-D105, the State of Connecticut permits managed residential communities ("MRCs") that offer certain "core services" to also offer "assisted living services" via an "assisted living services agency" ("ALSA").  MRCs must be registered with, but are not licensed by, the Department of Public Health.  ALSAs are licensed and inspected by the Department of Public Health *See* Regs. Of Conn. State Ag. § 19-D13-D105(b),(c).

the Defendants to "allocate funds, pursuant to the Medicaid program under Title XIX, as administered by the State of Connecticut, to pay for her care at Arden Courts as soon as her private estate is unable to make payment."

For the following reasons, Plaintiff's amended complaint should be dismissed in its entirety because the Plaintiff lacks standing to bring this action and because she has failed to state a claim upon which relief can be granted.

## THE MEDICAID PROGRAM

The Medicaid Program, established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*., is a jointly funded state and federal program that pays for necessary medical care for qualifying low-income individuals. States need not participate in Medicaid, but if they do, they must comply with Title XIX requirements and implementing regulations. States participating in Medicaid must administer the program based on a state plan approved by the Center for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"). 42 U.S.C. § 1396(a); 42 C.F.R. § 430.10. Failure to conform a state plan to federal requirements or to administer the plan in conformity with them may result in a loss of federal funds for the program. 42 U.S.C. § 1396c.

The federal Medicaid statute defines "medical assistance" to include various medical, health, and supportive services. 42 U.S.C. § 1396d(a). Coverage of certain of these services, such as hospital and nursing facility care, is mandatory for some groups, while other services such as physical therapy, may be provided at the state's option. 42 C.F.R. §§ 440.210-440.225. Only the mandatory services and optional services included within the state's approved plan may be covered. 42 U.S.C. § 1396c.

The Medicaid program also provides coverage for three basic types of inpatient services, including room and board: hospitals, nursing facilities, and certain intermediate care facilities for the mentally retarded ("ICF/MR."). 42 U.S.C. § 1396d(a)(1),(4),(14),(15),(16). These facilities must meet both state licensing and federal certification standards in order to receive reimbursement from the Medicaid program. 42 U.S.C. § 1396d(c),(d),(h) and § 1396r; *see also* 42 C.F.R. §§ 440.10(a)(3)(iii), 440.150(a)(3), 441.151(b).

Of particular relevance to the Plaintiff's complaint is the Medicaid statute's definition of a nursing facility as an institution which

(1) is primarily engaged in providing to residents

   (A) skilled nursing care and related services for residents who require medical or nursing care,

   (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or

   (C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities . . .;

(2) has in effect a transfer agreement . . . with one or more [Medicare-certified] hospitals . . . and

(3) meets the requirements for a nursing facility described in subsections (b), (c), an (d) of this section [pertaining to the provision of services, residents' rights, sanitation, physical environment, and other matters].

42 U.S.C. § 1396r(a)

To participate in Medicaid, a nursing facility must meet certain certification requirements and is subject to on-site inspections, or "surveys." 42 U.S.C. § 1396r(a)(3); 42 C.F.R. §§ 483.1, *et. seq.* If, through the results of these surveys, it is determined that a nursing facility no longer meets Medicaid program requirements, various sanctions may be imposed, including termination

4

of the facility's provider agreement, and, hence, termination of participation in the Medicaid program and loss of Medicaid reimbursement. 42 U.S.C. § 1396r(h).

Moreover, "a physician must personally approve in writing a recommendation that an individual be admitted to a facility. Each resident must remain under the care of a physician." 42 C.F.R. § 483.40 Thus, although the Plaintiff alleges in her complaint that once her funds are exhausted, she will simply move to a nursing facility, she will be unable to do so absent a physician's recommendation. A nursing home is an institution, not a housing choice. Furthermore, once admitted to a nursing facility, each resident is thereafter periodically assessed, and the possibility exists that even if initially admitted, a resident could ultimately be discharged. 42 C.F.R. § 483.20

Finally, and perhaps most importantly, just as the Plaintiff presumes that she will meet the medical admission requirements to a nursing home this fall, she also presumes that she will meet the financial eligibility requirements of the Medicaid program. There are a myriad of reasons that the Plaintiff would not, in fact, automatically qualify for Medicaid assistance upon exhausting her liquid assets, such as having made an improper transfer within the applicable statutory lookback period.

Nonetheless, as the Plaintiff alleges, the Medicaid program does cover care in a nursing facility, including room and board, for individuals who meet the eligibility requirements. There is no specific reference in the federal Medicaid statute, however, to assisted living services. More importantly, the statute neither provides coverage for the residential or room and board component of an assisted living facility, nor, in the more specific case of the state of Connecticut, for the cost of a managed residential care community where ALSA services can be provided. The federal statute also does not establish any certification requirements for such

facilities. *See* State of Texas v. Department of Health and Human Services, 61 F.3d 438, 442 (5th Cir. 1995)(noting that the Medicaid statutory scheme "reveals an intent to use limited Medicaid dollars to pay for room and board expenses only in those facilities for which Congress has extracted the quid pro quo of federal quality assurance standards [i.e., hospitals, nursing facilities, and intermediate care facilities for the mentally retarded].")

In addition to the services set forth in a state's approved state plan, the Secretary has the authority and discretion to grant waivers the furnishing of certain "home or community based" services that would not otherwise qualify as medical assistance under the program,[2] or that would be provided in a manner that would otherwise violate certain Medicaid statutory requirements, but only if such services are furnished to individuals who, but for the provision of such services, would require the level of care provided in a hospital, nursing facility, or ICF/MR. *See generally* Skandalis v. Rowe, 14 F.3d 173, 176 (2d Cir. Conn. 1994). Home and community based services enable elderly, disabled, or chronically ill persons who would otherwise be institutionalized to live in the community. Significantly, however, the statute precludes a state from including "room and board" as a home and community based service. *See* 42 U.S.C. § 1396n(c)(1); *See also* 42 U.S.C. § 1396t(a)(9) and § 1396u(f)(1) (excluding "room and board" from "home and community care" and "community supported living arrangements services".)

Pursuant to the above-cited provisions, a state may receive federal funding under Medicaid for a broad range of personal, supportive, or health services provided to elderly citizens receiving assisted living services. See Senate Report No. 158(1), 107th Congress, 2d Session 2002, Developments in Aging: 1999 and 2000- Volume 1, available at WL 126111 at *110 (Leg. History), attached hereto as Exhibit A, at 110-111; Robert Mollica, State Assisted Living

---

[2] The types of health or supportive services that could be included in such a waiver are discussed more extensively in the Secretary's brief.

Practices and Options, September 2001, at 8, attached hereto (hereinafter Mollica) ("Medicaid is very flexible and offers states an array of options for setting eligibility and covering [assisted living] services.")  As noted above, a state may provide these services under its state plan or under a home and community based waiver.  Most states that offer Medicaid coverage for assisted living services do so through the waiver option.  Senate Report, *supra*, at 110; Mollica, *supra*, at 8.  Again, however, the coverage that is available would be for assisted living services, not for room and board, which is consistent with the Medicaid statute's prohibition of federal funding for assisted living room and board charges.

For example, in the State of Connecticut, assisted living services are defined by the regulations as nursing and assistance with activities of daily living (ambulation, feeding, bathing, dressing, grooming, toileting, oral hygiene, transfers, exercise, and supervision of self administration of medications.)  Regs. Of Conn. State Ag. §§ 19a-13-D105(a)(2),(4).  Assuming arguendo, therefore, that the Commissioner could either amend Connecticut's state plan to allow ALSA services to be a covered service, or obtain a waiver allowing for assisted living services to be covered as a home based community service, only the ALSA services would be covered by the Medicaid program.  The room and board provided by managed residential communities such as Arden Courts, which are not licensed or certified, could not be covered by Medicaid because they are not medical services as defined by the Medicaid statute or Regs. Of Conn. State Ag. § 19-13-D105(a)(9).

Thus, there is a very minimal "medical" component to managed residential communities that contract with assisted living agencies in the State of Connecticut.  In this state, it is primarily a housing arrangement offering minimal personal assistance and can cost as much as $5,750.00 per month. *See, e.g.*, AARP Connecticut Assisted Living Survey,  February 2002, p. 2, attached

hereto. Only a small portion of this monthly charge, therefore, tends to be for actual ALSA charges. See <u>OLR Research Report:  Financial Assistance For Assisted Living</u>, Nov. 28, 2001, p.2, attached hereto. (Noting that "average annual rent range[s] between roughly $18,000.00 and $30,000.00 for a small studio to between $41,000 and $45,000 for a more luxurious two-bedroom apartment.  The rent . . . covers room and board, activities, some housekeeping, transportation, and minimal other services.  The actual assisted living services can add another $4,800 to $12,000 a year to the total cost.")

It should be noted that in the State of Connecticut, the legislature recently approved an extremely limited assisted living pilot project, to be administered by the Commissioner. (Affidavit of Michelle Parsons and copy of enabling legislation, P.A. 02-7, §§ 27, 28 attached hereto)  These pilot projects do not appear to have any impact on the Plaintiff's claims because participants in the pilot programs must already be eligible for services under either the existing home based community Medicaid waiver or the state funded portion of the Connecticut Home Care for the Elderly program established under Conn. Gen. Stat. § 17b-352, and it does not appear from the face of the complaint that the Plaintiff meets either of these requirements.  In addition, the State Defendant has no record that either the Plaintiff, or Arden Courts itself, has applied to participate in the program.  (Affidavit of Michele Parsons)  More importantly, the pilot program pays only for ALSA services, not for the cost of room and board provided by the MRC.  As in the case where the monthly charge is $5,750.00, the resident remains responsible for most of the charges as they are likely to be for costs associated with the managed residential community (primarily room and board), and not ALSA services, because under a waiver, Medicaid cannot pay for room and board outside of an institution. 42 C.F.R. § 441.360(b).

I.    **ARGUMENT**

      **A.  The Plaintiff Lacks Standing.**

"The question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed. 2d 343 (1975). Since the standing requirement is derived from Article III limitations on the federal courts' powers, it is the threshold issue in every case. To demonstrate standing a plaintiff must establish first that he has suffered some "distinct and palpable injury." Gladstone, Realtors v. Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed. 2d 66 (1979), *quoting* Warth, *supra*, 422 U.S. at 490, 501, Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed. 2d 184 (1970). Second, the injury must be the result of the "putatively illegal conduct of the defendant." Gladstone, *supra*, 441 U.S. 91 at 99. In other words, plaintiff must show that the injury "fairly can be traced to the challenged action." Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 41, 96 S.Ct. 1917, 48 L.Ed. 2d 450 (1976). Nor may the causation between the illegal conduct and the injury be too attenuated. Allen v. Wright, 468 U.S. 737, 750-52, 104 S.Ct. 3315, 3324-25, 82 L.Ed. 2d 556 (1984). Finally, it must be likely that plaintiff's injury will be redressed by a favorable court decision. Valley Forge Christian College v. Americans United for Seperation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed. 2d 700 (1982).

In addition to the Article III standing requirements, there are judicially-created prudential policy limitations on the exercise by a federal court of judicial power. *See e.g.*, Allen v. Wright, *supra*, 468 U.S. 737 at 750.

These judicially self-imposed limits prevent a litigant from resting his claim to relief on the legal rights of some third party, and also bar adjudication of abstract questions that, although perhaps of wide public significance, really amount to no more than generalized grievances. *Id.* They also require plaintiff's complaint to fall within "the zone of interests to be protected or

regulated by the statute or constitutional guarantee in question." <u>Association of Data Processing</u>

<u>Service Organizations,</u> *supra,* 397 U.S. 150 at 153.

The Plaintiff in the instant case does not satisfy the three-part so-called "injury-in-fact"

test set forth above and does not have standing to maintain this action. At most, the Plaintiff

alleges the threatened harm of having to leave Arden Courts and move into a nursing facility

when her funds are exhausted. (Complaint, ¶¶ 8-10) However, the Plaintiff admits that her funds

have been sufficient to allow her to stay until at least fall, 2004. More importantly, she has not

demonstrated that she will be eligible for Medicaid benefits when the funds referenced in her

Amended Complaint are exhausted. In fact, she has not even demonstrated that she has begun

the Medicaid application process,[3] which is quite extensive. (See attached Medicaid application

for the State of Connecticut.) In addition, the Plaintiff has failed to demonstrate that a nursing

facility would be an inappropriate placement for her in a few months. It is impossible for any

individual, particularly an individual such as the Plaintiff who is elderly and has been diagnosed

with Alzheimer's, to concisely and accurately predict their future health care needs. Finally, and

perhaps most importantly, she has not applied for or been denied Medicaid benefits for care in

any setting.

Consequently, the Plaintiff has failed to demonstrate any actual injury. Moreover, since

the original Complaint was filed almost two years ago, and the threatened injury has not occurred

and will not occur for several months, if it occurs at all, it can hardly be qualified as imminent or

impending so as to invoke the Article III jurisdiction of this court. *See e.g.* <u>Whitmore v.</u>

<u>Arkansas,</u> 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed. 2d 135 (1990) (holding that to satisfy

the injury-in-fact test, the threatened injury must be "certainly impending;" a "possible future

---

[3] She has also never applied to participate in the limited pilot program.

injury" is insufficient.)  City of Los Angeles v. Lyons, 461 U.S. 95, 101, 103 S.Ct. 1660, 75

L.Ed. 2d 675 (1983) (A plaintiff must show that he has "sustained or is immediately in danger of

sustaining some direct injury.")

Finally, the Plaintiff has failed to satisfy the redressability requirement of Article III

standing.  The Plaintiff assumes that, if the Medicaid program is required to reimburse ALSA

services to the same extent that nursing facility care is covered, she would be able to remain at

Arden Courts indefinitely.  First, again, she assumes that she will not need a higher level of care

than ALSA services.  She may in fact, at any time, need a level of care higher than the basic

nursing and assistance with activities of daily living provided by ALSAs.  Second, as discussed

above, even if ALSA services were reimbursed by Medicaid, the room and board she receives

from the managed residential community component of Arden Courts do not qualify for

Medicaid reimbursement.    Finally, even if the rate of reimbursement were not an issue, there is

no guarantee that Arden Courts would either elect to enter into a provider agreement with the

Commissioner and the Secretary, or that Arden Courts would be able to meet any forthcoming

certification requirements.  (See attached nursing facility provider agreement for the State of

Connecticut Medicaid program.)

It is clear from the Plaintiff's Complaint that the she would rather live at Arden Courts

than a nursing home.  However, as the Connecticut Supreme Court once noted in reviewing a

Medicaid appeal: "[[S]ympathy is an insufficient basis for a recovery based on a theory

inconsistent with the law.  A reviewing court may not ignore federal regulations simply because

it interprets [the Social Security Act] in manner it considers preferable to the Secretary's

interpretation."  (Internal quotation marks and citations omitted.)  Clark v. Commissioner, 209

Conn. 390, 406, 551 A.2d 729 (1988).  That court continued:  "'T[he] legislature recognized the

11

primacy of the applicable federal provisions and this court must be guided by those provisions. Stated in another way, the federal statutes and regulations set a limit upon the authority of the commissioner as well as furnishing a guide to his administration of the program.' Morgan v. White, 168 Conn. 336, 343-44, 362 A.2d 505 (1975)." Clark, supra, 209 Conn. 390 at 396-97.

For these reasons, the Plaintiff lacks standing to maintain this action and it should be dismissed.

### B. The Plaintiff Fails to State A Claim Upon Which Relief Can Be Granted.

Even if the Plaintiff could surmount the jurisdictional obstacles raised by Article III, her claim must be dismissed for failure to state a claim upon which relief can be granted.

The Plaintiff seeks declaratory relief pursuant to 42 U.S.C. § 1983. She claims that the defendants' failure to cover the cost of her care at Arden Courts under the Medicaid program violates her rights under the due process clause of the Fifth Amendment, and the due process and equal protection clauses of the Fifth and Fourteenth Amendments. She also alleges that the defendants' failure to cover the cost of her care at Arden Courts under the Medicaid program violates Title II of the ADA.

### 1.   42 U.S.C. § 1983

The Social Security Act, including Title XIX, does not afford a private cause of action against a state. Edelman v. Jordan, 415 U.S. 651, 673-74, 94 S.Ct. 1347, 1361, 39 L.Ed. 2d 662, 679 (1974) rehearing denied 416 U.S. 1000, 94 S.Ct 2414, 40 L.Ed. 2d 777 (1974). The only possible basis for subject matter jurisdiction in her claims against the Commissioner would be an enforcement of federal rights pursuant to 42 U.S.C. § 1983, which provides, in pertinent part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

However, § 1983 does not permit an action against a state official merely because he or she is alleged to be acting in violation of federal law in some way. Instead, to bring a claim under § 1983, a plaintiff must allege that a defendant is violating a right secured "by the Constitution and laws" of the United States. The Plaintiff here merely asserts that because the Commissioner administers the Medicaid program for the state of Connecticut, and because the Medicaid program covers skilled nursing in a nursing facility but not assisted living, her constitutional rights of equal protection and due process, and her rights under the ADA have been violated. As set forth below, this is insufficient to state a § 1983 claim upon which relief can be granted.

### a. The Statutory Classification Challenged By the Plaintiff Does Not Offend the Equal Protection Clause.

The Plaintiff's claim with respect to the equal protection clauses of the Fifth and Fourteenth Amendments appears to be that because the federal government and the state of Connecticut[4] have provided Medicaid funding for nursing facility room and board charges, but not for assisted living services at managed residential communities, her equal protection rights have been violated. This claim is without merit.

The equal protection clause requires that people similarly situated be treated similarly. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed. 2d 313 (1985); Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. N.Y. 1995). The Equal Protection Clause of the Fourteenth Amendment does not create any new or substantive legal

rights, but simply stands for the proposition that the laws existing in any state should be held and enjoyed alike by all persons within its jurisdiction. It is not meant to restrain the normal exercise of governmental power, but rather to constrain the state from indulging in hostile or partial discrimination against a class or person. Louisville & N.R. Co. v. Malton, 218 U.S. 36, 52, 30 S.Ct. 676, 54 L.Ed. 2d 921 (1910).

The Plaintiff has not challenged any state law as creating an illegal classification. Fetterusso v. New York., 898 F.2d 322, 325 (2d. Cir. N.Y. 1990). In order for the Plaintiff to demonstrate that her right to equal protection was violated, she would have to establish that she was treated differently from other individuals in her circumstances. Brandon v. District of Columbia Bd. of Parole, 823 F.2d 644, 650 (D.C. Cir. 1987). See also Pryor-El v. Kelly, 892 F.Supp. 261, 269 (D.C. Cir. 1995). However, in the Complaint itself, she concedes that her situation is the same as other individuals in her circumstances.

Second, she must demonstrate that any such unequal treatment

---

[4] As discussed above, Connecticut's limited pilot project with respect to assisted living is irrelevant to this case because the Plaintiff does not appear to qualify for the project and because the pilot project specifically excludes the room and board costs associate with the managed residential community.

was the result of intentional discrimination. <u>Allen v. Cuomo</u>, 100 F.3d 253, 261 n.1 (2d Cir. N.Y. 1996). Even if the Plaintiff were able to demonstrate these two predicates, the court then only examines the government's actions under rational basis review. *Id.* "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." <u>Buckley v. Valeo</u>, 424 U.S. 1, 93, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)

Thus, the Plaintiff has failed to meet either of the necessary criteria in order to state an equal protection claim. She fails to even allege in her complaint that she is or will be treated differently than similarly situated individuals. Nor is there any allegation that the plaintiff was intentionally discriminated against by the Commissioner. In fact, the Plaintiff specifically alleges that similarly situated individuals do in fact face the same treatment: "Other individuals, such as [the Plaintiff], who do not need skilled nursing care, because they are otherwise physically healthy, but who cannot live alone due to their suffering from dementia, are involuntarily forced to enter a nursing or convalescent home ...." (Complaint, ¶ 8) Accordingly, the complaint fails on its face to state a cognizable equal protection claim and should be dismissed.

### b. The Statutory Classification Challenged By the Plaintiff Does Not Challenge the Due Process Clause

The Plaintiff's claim that her due process rights have been violated by the fact that residents of skilled nursing facilities in the State of Connecticut may have their care covered by the Medicaid program while residents at managed residential communities receiving ALSA services may not is also without merit.

Substantive due process under the Fifth Amendment bars certain arbitrary, wrongful government actions regardless of their procedural fairness. <u>Conway v. Searles</u>, 954 F. Supp. 756, 770 (D.Vt. 1997). The complaint bears the burden of showing that the legislature, in passing the

challenged law, acted in an arbitrary, irrational manner. <u>Conway v. Sorrell</u>, 894 F. Supp. 794, 803 (D.Vt. 1995) *motion granted sub nom.* 954 F. Supp. 756 (D.Vt. 1997). A plaintiff setting forth a substantive due process claim must show that the government unlawfully interfered with an identified property interest. <u>Interboro Institute, Inc. v. Maurer</u>, 956 F. Supp. 188, 196 (N.D.N.Y. 1997).

To properly state a substantive due process claim, a plaintiff must identify a property interest and explain how it has been interfered with by the government. *See* <u>Greene v. Town of Blooming Grove</u>, 935 F.2d 507, 510 (2d Cir. N.Y. 1991), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 639, 116 L. Ed. 2d 657 (1991); <u>Brady v. Town of Colchester</u>, 863 F.2d 205, 215 (2d Cir. Conn. 1988); <u>Reno v. Flores</u>, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed. 2d 1 (1993). It is important to note that "substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'"

"[P]roperty interests ... are not created by the Constitution." <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L. Ed. 2d 548 (1972). "Rather they are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlements to those benefits." *Id.*

Presumably, the Plaintiff's claimed property interest here is in Medicaid coverage for care, including room and board, at Arden Courts. However, "[P]ossession of a property interest in a government benefit requires more than an abstract need or desire for it; there must be 'a legitimate claim of entitlement to it.'" *Id.* (Addressing procedural due process claim.). Here, the Plaintiff cites no state law that would serve as a basis for her claim of entitlement.

Without a valid property interest, the Plaintiff's substantive due process claim cannot succeed. See, e.g. O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 785, 100 S. Ct. 2467, 65 L. Ed. 2d 506 (1980) (Rejecting attempt of nursing home residents to enjoin transfer to another nursing home after their home was decertified from Medicaid program on basis of violation of fifth amendment due process rights: "Whether viewed singly or in combination, the Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in the home of one's choice.")

As with an equal protection inquiry, the test of a due process claims is whether there is "a legitimate legislative purpose furthered by rational means." General Motors Corp. v. Romein, 503 U.S. 181, 191, 112 S.Ct. 1105, 117 L.Ed. 2d 328 (1992).

Here, the federal Medicaid statute, and the Commissioner's administration of it in the State of Connecticut, can clearly survive a substantive due process challenge. As demonstrated by the attached Senate report, Congress' desire to conserve federal Medicaid funds by limiting inpatient coverage to recipients with the greatest medical and nursing needs within facilities that meet federal certification standards provides the requisite rational basis for the omission of Medicaid coverage for assisted living in Connecticut. Moreover, the Plaintiff has made no showing that the Commissioner is administering the Medicaid program in the State of Connecticut arbitrarily or outside the scope of federal or state law. Accordingly, the Plaintiff's substantive due process claim must be dismissed in its entirety.

### c.     Plaintiff's Claims Do Not Violate Title II of the ADA

The Plaintiff has amended his complaint by adding the following allegation: "The plaintiff further seeks relief, against both defendants, pursuant to Title II of the Americans With Disabilities Act ("ADA"). (Complaint, ¶1) While providing no further specification as to the manner of alleged violation of the ADA, plaintiff's counsel had indicated at oral argument on the

17

motions to dismiss the original complaints that he intended to amend the complaint to add a claimed violation of the ADA under the United States Supreme Court case, <u>Olmstead v. Georgia Department of Human Resources</u>, 527 U.S. 581 (1999).  From the face of the amended allegations, it is unclear if that remains the intention of plaintiff's counsel, but if so, the claim fails.

Title II of the ADA prohibits discrimination in the provision of public services as follows:

Pursuant to the ADA,

[n]o qualified individual with a disability shall, by reason of such disability, be … denied the benefits of the services [or] programs … of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. §12132.

For purposes of the ADA, a "qualified individual with a disability" is one who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.[5]" 42 U.S.C. 12131(2).  "Disability" is defined as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

Federal regulations promulgated by Congress under Title II require a public entity to "administer programs . . . in the most integrated settings appropriate to the needs of qualified individuals with disabilities," and to "make reasonable accommodations [to avoid]

---

[5] Again, because the Plaintiff has not filed an application for Title XIX assistance, it is unknown whether she in fact meets the "essential eligibility requirements" for the State of Connecticut's Medicaid program.  Moreover, as she does not currently participate in any state program, she

discrimination on the basis of disability," but does *not* require measures that would "fundamentally alter the nature of the service, program, or activity. " 28 C.F.R. §§ 35.130(d); 35.130(b)(7).

Essentially, the Plaintiff in this case argues that it is somehow discriminatory to provide Medicaid funding for skilled nursing facilities but not managed residential care facilities that contract with assisted living services agencies, and that if she is "forced" to move to a nursing home when her assets are depleted, this constitutes discriminatory institutionalization. Plaintiff's reasoning is flawed and these claims would fail.

In the Olmstead case, *supra,* the United States Supreme Court examined whether the State of Georgia's[6] refusal to provide services to mentally disabled persons in "community settings," instead of institutions, violated the ADA. The Court held that such action would violate the ADA only

> when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

Olmstead, *supra*, 119 S.Ct. at 2181.

Thus, states can, under Olmstead, "resist modifications that would fundamentally alter the nature of their services and programs." Id. The Court further notes that

> [s]ensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of

---

cannot claim that the State defendant has notice of her claimed disability and is taking discriminatory action on account of it.

[6] It should also be noted that in the Olmstead case, unlike the instant case, the Plaintiff were located in a state-run institution and sought to be released to a state-run community based program, and, further that the state itself had determined that community placement was appropriate. Here, the Plaintiff is presently located in a private location and fears transfer to a private skilled nursing facility.

> available resources, immediate relief for the plaintiffs would be inequitable, given
> the responsibility the State has undertaken for the care and treatment of a large
> and diverse population of persons with mental disabilities.

Id.

Claims more similar to the Plaintiff's than those in the Olmstead case have been unsuccessfully pursued in the Second Circuit. For example, in Rodriguez v. City of New York, 197 F.3d 611 (2d Cir. 1999), the plaintiffs claimed, inter alia, that it was a violation of the ADA for the state to provide certain personal care services to Medicaid recipients, but not safety-monitoring services:

> Appellees are members of a class that are eligible to receive Medicaid and who
> suffer from mental disabilities -- such as Alzheimer's disease – that cause them to
> require assistance with daily living tasks.  They have received personal care
> services but allege that, without the provision of safety monitoring as an
> independent service, the services provided are inadequate to meet their medical
> needs and to allow them to continue living in their homes . . . . Appellees argue
> that safety monitoring is comparable to the other personal care services that New
> York does provide and that they cannot remain in their homes without it.  They
> claim that this omission constitutes unlawful discrimination against otherwise
> eligible, mentally disabled patients.

Rodriguez, supra, 197 F.3d at 614.

In overturning the district court's granting of the plaintiff/appellee's permanent injunction, the Second Circuit in Rodriguez noted that while Section §1396a(a)(10)(B) of the Medicaid Act mandates that "medical assistance made available to any individual … shall not be less in amount, duration or scope than the medical assistance made available to any other such individual," this section "does not require a state to fund a benefit that it currently provides to no one.  Its only proper application is in situations where the same benefit is funded for some recipients but not others." Id. at 616 (internal citations omitted).  The Court further noted that "[b]ecause New York's program does not impermissibly discriminate under Section

1396a(a)(10)(B), New York may prevail simply by showing that the decision not to include safety monitoring as an optional benefit was reasonable. ... Moreover, the federal Health Care Financing Agency, which is responsible for administering the Medicaid program – informed New York that its decision was not only reasonable but proper: ...[T]he supervising/monitoring of an individual, by itself, without the provision of personal care services, would not be considered personal care services for Medicaid purposes." Id. at 616-17 (internal citations omitted.)

The Second Circuit also rejected the plaintiff's argument that "the purpose of the personal care services [benefit] is to enable recipients to reside in their homes, and their argument goes, because safety monitoring enables appellees to remain at home, it must be provided. This analysis is, however, at the incorrect level of generality. Instead of examining the particular need addressed by a particular service, it focuses on the presumed purpose of an entire package of personal care services. This approach is contrary to the text of the regulation and to the purpose of the Medicaid Act." Id. at 617.

Finally, and most importantly to the disposition of the instant Plaintiff's claim, the Rodriguez court squarely rejected the plaintiff's ADA claim: "The ADA requires only that a particular provided to some not be denied to disabled people. ... Hence, what the appellees are challenging is not illegal discrimination against the disabled, but the substance of the services provided." Id. at 618.

The Rodriguez court in fact emphasized that "In Olmstead, the parties disputed only – and the Court addressed only – *where* Georgia should provide treatment, not *whether* it must provide it. ... Olmstead does not, therefore, stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions. Instead, it holds only that

States must adhere to the ADA's nondiscrimination requirement with regard to the services *they in fact provide* ... Appellees want New York to provide a new benefit, while <u>Olmstead</u> reaffirms that the ADA does not mandate the provision of new benefits." <u>Id</u>. at 619. (Emphasis in original.)

The Second Circuit came to a similar conclusion in <u>Wright v. Giuliani et al.</u>, 230 F.3d 543 (2d Cir. 2000). In <u>Wright</u>, five individuals who had been diagnosed with HIV and/or AIDs brought suit on behalf of themselves and a putative class, alleging that various officials of the City of New York had failed to provide them with emergency housing that accommodated their disability.

The municipal benefit program at issue in <u>Wright</u> provided "medically appropriate transitional and permanent housing" to "every eligible person with clinical/symptomatic HIV illness or with AIDs who requests assistance." <u>Id</u>., at 545. In affirming the district court's denial of a preliminary injunction, the Second Circuit noted that

> The district court construed Circuit precedent to require that in any Rehabilitation Act or ADA analysis, "courts must focus on the specific services provided to the able-bodied and compare them to the services provided to the disable." The court emphasized that the Rehabilitation Act and the ADA guarantee no specific benefits; they require only that "the particular benefits provided to the able-bodied be meaningfully accessible to the disabled."

<u>Id</u>., at 547.

The <u>Wright</u> court further noted that "[the] distinction between affording (i) 'meaningful access' through 'reasonable accommodation' and (ii) 'additional substantive benefits' is crucial to the merits of this case. ...." <u>Id</u>., at 548. The <u>Wright</u> court then discussed other Second Circuit decisions, including <u>Rodriguez</u>, and concluded that

> [t]he thrust of these cases is that the disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be. They require only that covered entities make

'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether those services are adequate or not.

Id.

Finally, the Wright court concluded that the district court in that case properly denied the requested injunction because there was inadequate evidence that the plaintiffs were seeking "reasonable accommodations" as opposed to "additional, substantive benefits." Id.

In the instant case, as in Rodriguez and Wright, Medicaid funding is not provided to *anyone* in similar circumstances.[7] The Plaintiff cannot, therefore, claim that such funding is being withheld from her on a discriminatory basis. In fact, given that room and board cannot, by statute, be covered by Medicaid, even in a waiver program, her claim is indeed one for an "additional substantive benefit," proscribed by Wright, rather than a claim for a reasonable accommodation for a disability. As Justice Kennedy noted in his Olmstead concurrence" a state without a program in place is [not] required to create one. No State has unlimited resources and each must make hard decisions on how much to allocate to treatment of diseases and disabilities." Olmstead, *supra*, at 612. Justice Kennedy further noted that if modifications would fundamentally alter the nature of the service, program, or activity, "[i]t follows that a state may not be forced to create a community-treatment program where none exists." Id.

Accordingly, the plaintiff's claim that the lack of Medicaid funding for Arden Courts violates the ADA must be dismissed.

---

[7] With the exception of those individuals participating in the state's pilot program, *infra*, (where Medicaid funding is provided only for ALSA services, *not* for "room and board" which in fact constitute the bulk of the monthly expenses. *See* attached OLR Report.

## CONCLUSION

For the foregoing reasons, the Plaintiff's complaint against the Commissioner must be dismissed in its entirety.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Tanya Feliciano
Assistant Attorney General
Federal Bar No. ct14996
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5210
Fax: (860) 808-5385

## CERTIFICATION

I hereby certify that a copy of the foregoing  Memorandum of Law In Support of State Defendant's Motion to Dismiss was mailed in accordance with Rule 5(b) of the Federal Rules of Civil Procedure on this 16th day of July, 2004,  first class postage prepaid to:

Raymond J. Rigat, Esq.
Gilbride & Rigat
23 East Main Street
Clinton, CT 06413

Carolyn A. Ikari
Assistant U.S. Attorney
450 Main Street, Room 328
Hartford, CT  06103

Clifford M. Pierce
Assistant Regional Counsel
Department of Health and Human Resources
J.F.K. Building, Room 2250

_____
Tanya Feliciano
Assistant Attorney General