# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MICHELA LEOCATA,                          :
through Matthew T. Gilbride, Esq.,        :
Conservator over her Estate and           :
Next of Friend,                           :
     Plaintiff,                         :    Civil Action No.
                       :    3:02 CV 1066 (CFD)
     v.                                 :
                       :
PATRICIA WILSON-COKER,                    :
Commissioner, Connecticut Department      :
of Social Services;                       :
                       :
and                                       :
                       :
TOMMY G. THOMPSON,                        :
Secretary of the U.S. Department of Health :
and Human Services,                       :
     Defendants                         :

## RULING ON MOTIONS TO DISMISS
## AND MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Michela Leocata ("Leocata") brought this action against Patricia Wilson-Coker,

Commissioner of the Department of Social Services of the State of Connecticut

("Commissioner") and Tommy G. Thompson, Secretary of the United States Department of

Health and Human Services ("Secretary") in connection with their roles in administering the

Title XIX ("Medicaid") program.[1]  Leocata alleges violations of 42 U.S.C. § 1983, Title II of the

Americans with Disabilities Act ("ADA"), and the Due Process and Equal Protection clauses of

the Fifth and Fourteenth Amendments.  She seeks declaratory and injunctive relief, attorney's

---

[1] The actual plaintiff is the conservator of Leocata's estate, Matthew Gilbride, who was appointed by the Connecticut Probate Court.  "Plaintiff," as referred to in this opinion, refers to Leocata.  The operative complaint is the original complaint of June 19, 2002, as modified by the plaintiff's amended complaint of July 9, 2004.

fees and costs.  The Secretary and the Commissioner have filed motions to dismiss the complaint

for lack of standing and for failure to state a claim upon which relief can be granted.  The

plaintiff has filed a motion for a preliminary injunction seeking temporary relief during the

pendency of this case and its appeal, if applicable.  For the reasons that follow, the motions to

dismiss are granted and the motion for a preliminary injunction is denied.

## I.  Facts[2]

Leocata is an elderly woman with advanced dementia who resides at Arden Courts in

Farmington, Connecticut.  Arden Courts is an assisted living facility ("ALF") that provides

residential care to elderly persons with various forms of dementia who do not need the extent of

skilled nursing care provided at a traditional nursing home.  Leocata pays for her care at Arden

Courts; her assets, however, are rapidly depleting and soon will be insufficient to cover the cost

of that care.

Leocata contends that the Medicaid program under Title XIX of the Social Security Act,

42 U.S.C. § 1396 et seq., and the relevant state statutes only allow benefits to be paid to skilled

nursing care facilities ("NF") and disallow payments to ALFs, even though the cost of care is

more expensive at skilled nursing care facilities.  Once Leocata cannot afford to pay for her care

at Arden Courts, she will be forced to relocate to a skilled nursing care facility despite the fact

that she does not require all the extensive medical services such facilities provide.  Moreover,

Leocata alleges that a skilled nursing care facility will not be able to address her special needs

adequately.  She contends that other recipients of state and federal aid pursuant to the Medicaid

program have their specialized medical care needs met.

---

[2]The facts are taken from the allegations of the plaintiff's complaint.

Leocata maintains that she will be forced to move out of Arden Courts to a skilled nursing care facility because of her poverty and the unfairness of Medicaid paying for skilled nursing facilities, but not assisted living facilities.  She also will suffer emotional distress as a result of being forced to relocate to another facility.

## II.     Motion to Dismiss Standard

When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Davis v. Scherer, 468 U.S. 183 (1984); Easton v. Sundram, 947 F.2d 1011, 1014-15 (2d Cir. 1991), cert. denied, 504 U.S. 911 (1992).  Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted.  See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Frasier v. General Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991).  "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims."  United States v. Yale-New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).  Thus, a motion to dismiss under 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994) (citations and internal quotations omitted), cert. denied, 513 U.S. 816 (1994).   In its review of a 12(b)(6) motion to dismiss, the Court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d

Cir. 1993).

### III.    Standing

The defendants allege that Leocata lacks standing to bring this action, since she currently does not receive Medicaid benefits, nor has she demonstrated that she will become Medicaid-eligible at any given time. Defendants further allege that Leocata has shown no actual injury, since she continues to reside at Arden Courts, and that her injury may not be redressable, since it is unlikely that Arden Courts would qualify as a service provider under the Medicaid regulations.

The Supreme Court has held that "a plaintiff must meet three requirements in order to establish Article III standing," those of injury in fact, causation and redressability. Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000). First, a plaintiff must demonstrate an "injury in fact" which is "concrete, distinct and palpable," and "actual or imminent, not conjectural or hypothetical." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (internal quotation marks and citations omitted). Second, a plaintiff must establish "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant, and not . . . the result [of] some third party not before the court.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)). Third, a plaintiff must demonstrate a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact." Stevens, 529 U.S. at 771 (quoting Simon, 426 U.S. at 45).

The Court finds that Leocata has presented facts sufficient to give her standing in the instant case. Due to the rapid depletion of her personal funds, she faces the imminent injury of

being forced to leave Arden Courts.[3]  It is undeniably true that Leocata would seek to stay at

Arden Courts if Medicaid would reimburse her room and board costs there.  It is also true that the

declaratory and injunctive relief Leocata seeks, requiring Medicaid to provide such

reimbursement, would redress her situation fully.  Article III requires that a party's standing be

determined prior to reaching the merits of his or her claims.  Therefore, regardless of the

likelihood of success of Leocata's complaint, the Court finds that she has sufficient standing to

pursue that complaint here.

IV.     **Discussion**

    A.     **The Challenged Statute**

The Medicaid program, established under Title XIX of the Social Security Act, 42 U.S.C.

§ 1396 et seq., is a "co-operative federal/state cost-sharing program designed to enable

participating states to furnish medical assistance to persons whose income and resources are

insufficient to meet the costs of necessary medical care and services."  DeJesus v. Perales, 770

F.2d 316, 318 (2d Cir. 1985).

States choosing to participate in Medicaid are required to comply with Title XIX's

requirements and implementing regulations.  42 U.S.C. § 1396a(a) sets forth the requirements of

state plans for medical assistance.  Participating states must agree to fund medical services to the

"categorically needy" in five general areas: (1) inpatient hospital services; (2) outpatient hospital

services; (3) other laboratory and X-ray services; (4) skilled nursing facilities services, periodic

---

[3] While Leocata's injury may have been speculative at the outset of this litigation, her
conservator testified at the preliminary injunction hearing in this case that Leocata's finances are
now nearly exhausted.  The Court finds that Leocata indeed faces the imminent prospect of
having to leave Arden Courts due to lack of funds.

screening and diagnosis of children, and family planning services; and (5) services of physicians. See 42 U. S. C. §§ 1396a(a)(13)(B), 1396d(a)(1)-(5).  While states do not have to fund all medical services within those five categories, they must establish "reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Title XIX]." 42 U. S. C. § 1396a(a)(17).  Once a state plan is approved by the federal Department of Health and Human Services, "the federal government partially reimburses the state for the state's expenditures in subsidizing medical services for needy citizens covered by its plan."  Lewis v. Thompson, 252 F.3d 567, 570 (2d Cir. 2001).

Because Medicaid only covers categorically needy persons, individuals do not become eligible for Medicaid assistance until they "spend down" their private assets below a income ceiling set by state statute.  See Schweiker v. Gray Panthers, 435 U.S. 34, 37-40 (1981).  A Medicaid-eligible individual may receive any of three basic types of inpatient services that provide room and board: hospitals, NFs, or intermediate care facilities for the mentally retarded ("ICF/MRs").  42 U.S.C. §§ 1396d(a)(1), (4), (14)-(16).  The statute also sets forth certification standards or participation requirements for these facilities.  42 U.S.C. §§ 1396d(c), (d), (h), and 1396r; see also 42 C.F.R. §§ 440.10(a)(3)(iii), 440.150(a)(3), 441.151(b), and 483, Subparts B and I.

A "nursing facility" is defined as an institution which—

> (1) is primarily engaged in providing to residents—
>> (A) skilled nursing care and related services for residents who require medical or nursing care,
>> (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or
>> (C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and

> services (above the level of room and board) which can be made
> available to them only through institutional facilities,
> and is not primarily for the care and treatment of mental diseases;
> (2) has in effect a transfer agreement (meeting the requirements of section
> 1395x(l) of this title) with one or more hospitals having agreements in effect
> under section 1395cc of this title; and
> (3) meets the requirements for a nursing facility described in subsections (b),
> (c), and (d) of this section.

42 U.S.C. § 1396r(a). Subsections (b), (c), and (d) set forth the requirements relating to

provision of services, residents' rights, and administration and other matters.

While the statute specifies numerous requirements for NFs, the statute makes no explicit

reference to ALFs. The Medicaid statute does not provide coverage for the residential or room-

and-board charges of an ALF. It also does not establish any certification requirements for ALFs.

In addition to inpatient services, qualified "medical assistance" that can be provided

under a state plan includes home health services and other personal care services offered to

individuals who reside in their homes or in community settings other than a hospital or NF. See

42 U.S.C. §§ 1396d(a)(7), (24).

### B.    Equal Protection Claims

Leocata contends that the Medicaid program violates her equal protection rights under the

Fifth and Fourteenth Amendments because it provides federal funding for NF room-and-board

charges, but does not provide funding for ALF residential services such as Arden Courts. The

parties agree that the Medicaid statute prohibits federal funding for the residential charges of an

ALF.

The Equal Protection Clause "creates no substantive rights. . . . Instead, it embodies a

general rule that States must treat like cases alike but may treat unlike cases accordingly." Vacco

v. Quill, 521 U.S. 793, 799 (1997).  Equal protection analysis is congruent under the Fifth and

Fourteenth Amendments.  See Adarand Contractors v. Pena, 515 U.S. 200, 218 (1995); Buckley

v. Valeo, 424 U.S. 1, 93 (1976); Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975).  The

basic framework for evaluating an equal protection claim under the Fourteenth Amendment was

set forth in San Antonio School District v. Rodriguez, 411 U.S. 1 (1973):

> We must decide, first, whether [the challenged statute] operates to the
> disadvantage of some suspect class or impinges upon a fundamental right
> explicitly or implicitly protected by the Constitution, thereby requiring strict
> judicial scrutiny. . . .  If not, the [legislative] scheme must still be examined to
> determine whether it rationally furthers some legitimate, articulated state purpose
> and therefore does not constitute an invidious discrimination. . . .

Id. at 17.

Generally, suspect classes are defined as groups who historically have been subjected to

discrimination; whose obvious, immutable, or distinguishing characteristics mark them as a

discrete community; or who are politically powerless due to their minority status.  See, e.g., Lyng

v. Castillo, 477 U.S. 635, 638 (1986); Plyler v. Doe, 457 U.S. 202, 216 n.14 (1982); Rodriquez,

411 U.S. at 28.   Inherently suspect classifications are those drawn upon factors such as race,

religion, or alienage.  See New Orleans v. Dukes, 427 U.S. 297, 303 (1976).  Such classifications

must be reviewed under a strict scrutiny analysis, and may not be upheld unless they are narrowly

tailored to achieve a compelling governmental interest.  See, e.g., Gratz v. Bollinger, 539 U.S.

244, 270 (2003).

In the instant case, the plaintiff contends that the elderly disabled constitute a suspect

class against which the current Medicaid statute discriminates.  Age, however, is not a suspect

classification under the Equal Protection Clause.  See Kimel v. Fla. Bd. of Regents, 528 U.S. 62,

83 (2000); Gregory v. Ashcroft, 501 U.S. 452, 470 (1991); Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 313 (1976).  Nor is disability considered a suspect classification requiring strict scrutiny.[4]  Classifications based on disability only violate the Equal Protection Clause if they lack a "rational relationship to a legitimate government purpose."  Tennessee v. Lane, 124 S. Ct 1978, 1988 (2004) (citing Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 466 (2001), and Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985)).  Nor does the Medicaid statute facially discriminate on the basis of either age or disability.  Plaintiff has not established the existence of a suspect classification, and may not invoke strict scrutiny review on that basis.

Leocata also argues that by denying her funding to stay at Arden Courts and forcing her into a more restrictive nursing facility, the Medicaid statute infringes upon her fundamental right to be free from unnecessary restraint.  The Supreme Court has construed this fundamental right, however, as the right to be free from arbitrary penal restraint and involuntary physical detention. See, e.g., Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2646 (2004) (holding that a citizen has an "interest in being free of detention by one's own government"); Kansas v. Crane, 534 U.S. 407, 413 (2002) (holding that the dangerousness of a previously convicted sexual predator may outweigh right to be free from restraint and warrant involuntary civil commitment); Foucha v. Louisiana, 504 U.S. 71, 80 (1992) (invoking right of freedom from unnecessary restraint in holding that individuals only may be detained in mental institutions as long as they are adjudged dangers to society).

---

[4] Of course, discrimination against persons with disabilities in employment; public services, programs, and activities; and public accommodations is prohibited by the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.  The Court will address the plaintiff's ADA claims in a separate section of this ruling.

In contrast to that line of cases, here the state neither is committing Leocata to an institution nor confining her against her will.  The Medicaid statute simply limits the payment of benefits to certain facilities.  Furthermore, the law is clear that no fundamental right exists to receive Medicaid benefits at all, let alone to receive them for a particular facility.  Leocata's only right is one of equal access to what benefits Medicaid provides, as long as she satisfies all the program's requirements.  See DeShaney v.Winnebago County Dep't. of Soc. Servs., 489 U.S. 189, 196 (1989) ("the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual"); Thomas v. Sullivan, 922 F.2d 132, 136 (2d Cir. 1990) ("There is no fundamental right to the receipt of benefits from the government").  Leocata's argument that the statute impinges on her fundamental right to be free from restraint thus fails.

When a statute does not disadvantage a suspect class and does not affect fundamental rights, the general rule is that it "is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).  States are afforded particularly wide latitude when the classification at issue is found in social or economic legislation.  See Kadrmas v. Dickinson Pub. Sch., 487 U.S. 450, 462-63 (1988); United States R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 174 (1981); New Orleans v. Dukes, 427 U.S. 297, 303 (1976).  The Equal Protection Clause also does not require that classifications be perfectly drawn; a rationally-based classification will stand even if it lacks "mathematical nicety or because in practice it results in some inequity."  Dandridge v. Williams, 397 U.S. 471, 485 (1970).

It is the plaintiff's burden to establish that there is no "reasonably conceivable state of facts that could provide a rational basis for the classification." Heller v. Doe, 509 U.S. 312, 320 (1993) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993)). A state has "*no* obligation to produce evidence to sustain the rationality of a statutory classification." Id. (emphasis added). Here, the plaintiff alleges that Medicaid's refusal to fund assisted living facilities is irrational because not all disabled elderly persons require advanced nursing care, and requiring them to live in NFs will cause them to mentally and physically deteriorate faster.

Even accepting plaintiff's allegations as true, Medicaid regulations repeatedly have been upheld as rationally related to Congress' desire to allocate a limited pool of funds as effectively as possible: "The administration of public assistance based on the use of a formula is not inherently arbitrary. There are limited resources to spend on welfare." Schweiker v. Gray Panthers, 453 U.S. 34, 48 (1981); see generally Schweiker v. Hogan, 457 U.S. 569 (1982) (holding that basing Medicaid eligibility on income was rational, even though in some instances persons with higher incomes might be in greater need of medical benefits); Schweiker v. Wilson, 450 U.S. 221 (1981) (holding that Congress made a rational distinction in limiting Supplemental Security Income benefits to health care facilities already receiving Medicaid funds); Harris v. McRae, 448 U.S. 297 (1980) (holding that state's refusal to fund medically necessary abortions for which no federal reimbursement was available did not violate Equal Protection Clause); Maher v. Roe, 432 U.S. 464 (1977) (holding that it was rational for state to encourage natural childbirth by providing Medicaid funds for prenatal care but not for non-therapeutic abortions); Lewis v. Thompson, 252 F.3d 267 (2d Cir. 2001) (holding that denying Medicaid prenatal care benefits to illegal alien pregnant women does not violate equal protection). Nor does Medicaid

require a state "to fund a benefit that it currently provides to no one." Rodriguez v. City of New York, 197 F.3d 611, 616 (2d Cir. 1999).  Furthermore, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." Heller, 509 U.S. at 321.

In light of this precedent, the Court finds that the Medicaid classification at issue rationally relates to the federal and state governments' desire to direct its limited funds to patients of advanced nursing care facilities.  The plaintiff thus has failed to state an equal protection violation upon which relief can be granted.  The Court grants defendants' motions to dismiss as to Leocata's equal protection claims.

### C.    Due Process Claims

Leocata also alleges that the Medicaid statute violates the Due Process Clause, since she has a constitutionally protected property interest in reasonable medical assistance, and a liberty interest in staying at Arden Courts and remaining free from the confines of a skilled nursing facility.

In Harris v. MacRae, 448 U.S. 297 (1980), a class of pregnant women sought an injunction prohibiting enforcement of the Hyde Amendment, a Congressional amendment to the Medicaid Act denying federal reimbursement for most abortions.  The plaintiff class argued that withholding Medicaid funding for medically necessary abortions violated their rights to due process and free exercise of religion.  See id. at 303-04.   Upon its review, the Supreme Court held that states were under no obligation to include in their plans medical services for which Congress has withheld funding: "[A]bsent an indication of contrary legislative intent by a subsequent Congress, Title XIX does not obligate a participating State to pay for those medical

services for which federal reimbursement is unavailable." Id. at 309.

The Harris Court also rejected the argument that withholding public funding for abortion impinged upon the plaintiffs' liberty interests and thus violated the Due Process Clause. While acknowledging that the Due Process Clause protected "freedom of personal choice in certain matters of marriage and family life," id. at 312, the Court found that the Constitution did not require the exercise of such freedom to be publicly subsidized:

> . . . . [I]t simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices. The reason why was explained in Maher: although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions . . . but rather of her indigency. Although Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all.

Id. at 316-17 (citing Maher v. Roe, 432 U.S. 464 (1977)). The Supreme Court noted that the procedural posture of the plaintiff class differed from that of an individual for whom Congress had withheld all Medicaid benefits "simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy." Id. at 317. While the latter situation implicated serious constitutional questions, the plaintiff class in Harris suffered from "a refusal to fund protected activity, without more," and such a restriction on a federal spending program could not be considered to penalize any constitutionally protected liberty interests. Id.

In the instant case, while Leocata may have a liberty interest in choosing where she wishes to live and receive medical services, the Due Process Clause does not oblige the federal or

state governments affirmatively to fund her exercise of that interest.  Indeed, "the Constitution imposes no obligation on the [government] . . . to pay <u>any</u> of the medical expenses of indigents." <u>Maher</u>, 432 U.S. at 469 (emphasis added).

Even more directly relevant to plaintiff's claims than the <u>Harris</u> case is the Supreme Court decision in <u>O'Bannon v. Town Court Nursing Center</u>, 447 U.S. 773 (1980).  In <u>O'Bannon</u>, a group of nursing home residents sought to enjoin the Pennsylvania Secretary of Public Welfare from decertifying the Town Court Nursing Center and transferring them to new Medicaid-qualifying facilities without a pre-termination hearing.  <u>See</u> <u>id</u>. at 775-76.  The residents argued that two due process rights were implicated: First, they contended that Medicaid provided them a property right to stay in the home of their choice absent good cause for transfer, which cause must be determined through a pre-transfer hearing.  Second, the residents argued that the grave emotional and physical side effects of being transferred (colloquially referred to as "transfer trauma") without the opportunity for a hearing unconstitutionally deprived them of life and liberty.  <u>See</u> <u>id</u>. at 784.

The Supreme Court found both of the residents' arguments "unpersuasive," going on to hold that

> Whether viewed singly or in combination, the Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in the home of one's choice. . . . [The Medicaid statute] gives recipients the right to choose among a range of *qualified* providers, without government interference.  By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified.  But it clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified.

<u>Id</u>. at 785.

14

The O'Bannon Court also concluded that residents had not suffered any due process violations, since the patients themselves were not suffering the loss of any direct benefits. Rather, any negative effects of the decertification process borne by the nursing home residents were merely the "indirect and incidental result of the Government's . . . action" to enforce the Medicare and Medicaid quality control regulations. Id at 787. Such indirect adverse effects of governmental action did not violate due process. Quoting The Legal Tender Cases, 79 U.S. (12 Wall.) 457, 551 (1871), the Supreme Court reiterated that the Due Process Clause only applies to "a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals." O'Bannon, 447 U.S. at 789.

Taken together, O'Bannon and Harris underscore that Leocata has no protected liberty or property interest that would require the Medicaid program to fund her continued residence at Arden Courts. The case law is clear that neither the federal government nor the states are required to assume the costs of any particular medical procedure or service under the Medicaid program. Therefore, Leocata has no entitlement to receive benefits for her room and board at an assisted living facility should Medicaid choose not to cover such services. Nor is Leocata's liberty interest in choosing her own residence affected by Medicaid's denial of benefits to assisted living facilities. While Leocata has every right to continue living at Arden Courts, the Government is not obliged to assist her financially in doing so. Should Leocata qualify for Medicaid benefits, she has a protected interest in obtaining medical services from a qualified provider. The fact that Arden Courts is not a qualified medical facility may, Leocata suggests, work a hardship upon her and negatively affect the dementia from which she suffers.

15

Unfortunately, such real but indirect hardships are not redressable through the Due Process Clause.  The Court grants the motion to dismiss Leocata's due process claims as to both defendants.

      **D.    American with Disabilities Act Claims**

In addition to her constitutional claims, the plaintiff has alleged that the failure of defendants to fund her care at Arden Courts violates her rights under Title II of the American with Disabilities Act, 42 U.S.C. § 12101 et seq.  Title II prohibits any public entity from discriminating against "qualified" persons with disabilities in the provision or operation of public services, programs, or activities.  See 42 U.S.C §§ 12131-34; see also Tennessee v. Lane, 124 S.Ct. 1978, 1984-85 (2004).  A qualified person is one who, "with or without reasonable modifications . . . or the provision of auxiliary aids and services" meets all eligibility criteria for the public service or activity in question.  42 U.S.C § 12131(2).  Leocata argues that placement at Arden Courts represents a reasonable accommodation for her dementia that will allow her to receive Medicaid benefits in the least restrictive setting possible.

In support of her ADA claim, Leocata argues that the Supreme Court decision in Olmstead v. L.C., 527 U.S. 581 (1999), requires that Medicaid fund the cost of Leocata's preferred residence.  The Olmstead respondents were two institutionalized mentally disabled women in Georgia who protested the Georgia Department of Human Resources' refusal to place them in community-based treatment programs.  The women alleged that Georgia's failure to provide them community-based treatment and their resulting institutional placements constituted discrimination in violation of Title II of the ADA.  See id. at 593-94.  On its review, the Supreme Court held that "unjustified isolation . . . is properly regarded as discrimination based on

disability" and that

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

Id. at 597, 607.

Leocata argues that Olmstead established a general rule that the ADA requires disabled Medicaid recipients to be provided care in the most integrated setting appropriate to their needs, and that she therefore should be accommodated at Arden Courts. The Second Circuit, however, has construed Olmstead more narrowly. That court pointed out that in Olmstead, Georgia was not being required to fund new community-based treatment. Several such state programs already existed, for which Georgia health officials had ruled the petitioners qualified: "Olmstead does not, therefore, stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions. Instead, it holds only that 'States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide.'" Rodriguez v. City of New York, 197 F.3d 611, 619 (2d Cir. 1999) (quoting Olmstead, 527 U.S. at 603 n.14).

In Rodriguez and in a subsequent case, Henrietta D. v. Bloomberg, 331 F.3d 261 (2d Cir. 2003), the Second Circuit held that a valid claim under Title II of the ADA requires that "there must be something different about the way the plaintiff is treated 'by reason of . . . disability.'" Henrietta D., 331 F.3d at 276 (quoting 42 U.S.C. § 12132). Such different treatment can be established either by showing acts of discrimination or, more simply, "the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with

17

and without disabilities." Id. at 277.

The goal of the Americans with Disabilities Act is to "assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied." Doe v. Pfrommer, 148 F.3d 73, 83 (2d Cir. 1998). The ADA does not require, however, that disabled persons be accommodated with new varieties of public benefits currently unavailable to anyone: "Even [when] plaintiffs have demonstrated that they are entitled to a reasonable accommodation, an accommodation that served as a grant of special substantive rights would not constitute appropriate relief." Henrietta D., 331 F.3d at 282. If a program's public services or benefits are available to all qualified individuals on an equal basis, no ADA claim stands: "The ADA requires only that a particular service provided to some not be denied to disabled people." Rodriguez, 197 F.3d at 618. It does not "establish an obligation to meet a disabled person's particular needs . . . ." Doe, 148 F.3d at 83.

Leocata does not allege that defendants have denied her any Medicaid benefits due to her disability. Nor does she allege any discriminatory animus by defendants against persons with dementia. She fails to meet the standards required by the Second Circuit for a valid claim under the ADA. Furthermore, Leocata desires that the defendants reasonably accommodate her under the ADA by funding her stay at Arden Courts. Such an accommodation, however, would represent a grant of special substantive rights to Leocata. The Second Circuit has stated specifically that "the ADA does not mandate the provision of new benefits." Rodriguez, 197 F.3d at 619. For these reasons, the Court dismisses Leocata's ADA claims as to both defendants.

**E.    Section 1983 Claim**

Leocata also alleges a violation of her civil rights by defendant Commissioner pursuant to

42 U.S.C. § 1983.  A plaintiff seeking relief under section 1983 must satisfy a two-part test: First, she must allege facts demonstrating that the defendant is a person acting under color of state law. Second, she must allege facts demonstrating that she has been deprived of a constitutionally or federally protected right.  See Lugar v. Edmondson Oil Co., 457 U.S. 922, 930 (1982); Washington v. James, 782 F.2d 1134, 1138 (2d Cir. 1986).

Leocata easily meets the first prong of this test.  The Commissioner's actions in her official capacity as an administrator of Connecticut's Medicaid program occur under color of state law.  The plaintiff fails, however, to allege sufficient facts showing that she has been deprived of constitutional or federally protected rights.  Leocata bases her section 1983 claim on the underlying due process, equal protection, and American with Disabilities Act violations alleged against both defendants.  As discussed above, the Court finds that Leocata has not stated any constitutional or federal statutory claims upon which relief can be granted.  Therefore, pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court also dismisses Leocata's section 1983 claim against defendant Commissioner.

## F.    Preliminary Injunction

Finally, Leocata seeks a preliminary injunction requiring defendants to pay her room and board costs at Arden Courts while her case continues before this Court, as well as during the pendency of any appeals.[5]

The Second Circuit has cautioned that preliminary injunctive relief is "an extraordinary and drastic remedy which should not be routinely granted."  Buffalo Forge Co. v.

---

[5] Leocata requests that this injunction become effective as soon as her personal funds are exhausted.

Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981) (internal quotations omitted).  Entry

of a preliminary injunction is appropriate where the moving party shows: "(1) irreparable harm in

the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b)

sufficiently serious questions going to the merits to make them a fair ground for litigation and a

balance of hardships tipping decidedly in the movant's favor." Random House, Inc. v. Rosetta

Books LLC, 283 F.3d 490, 491 (2d Cir. 2002) (citing  Zervos v. Verizon New York, Inc., 252

F.3d 163, 172 (2d Cir. 2001)).  When, however, the entry of a preliminary injunction would

affect "government action taken in the public interest pursuant to a statutory or regulatory

scheme, the injunction should be granted only if the moving party meets the more rigorous

likelihood-of-success standard." Beal v. Stern, 184 F.3d 117, 122 (2d Cir. 1999)).  Because

Leocata's requested injunction would affect the payment of Medicaid benefits, she will be held to

the more rigorous test, and must show both irreparable harm and likely success on the merits of

her claims.

 Even assuming that she would suffer irreparable harm by having to leave Arden Courts,

Leocata fails to meet the likelihood-of-success standard for preliminary injunctive relief.  The

Court finds that Leocata has not presented any claims upon which relief can be granted, and than

any appeal on her part most likely will be unsuccessful. See also Harris v. Rockefeller, 953 F.2d

1228 (2d Cir. 1972) (finding it "appropriate" for trial court to deny a preliminary injunction that

would have required Medicaid to reimburse for methadone treatments dispensed by unlicensed,

unapproved medical centers).  Therefore, the plaintiff's motion for a preliminary injunction is

denied.

**V.      Conclusion**

For the above reasons, the defendants' motions to dismiss [Docs. # 15, 20, 43, 52] are

GRANTED.  The plaintiff's request for a preliminary injunction [Doc. #27] is DENIED.  The

Clerk is directed to order judgment in favor of the defendants and close this case.

SO ORDERED this _____ day of November, 2004, at Hartford, Connecticut.


_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

_____